Madden, Judge,
delivered the opinion of the court:
This suit is brought by plaintiff band of the Nez Perce Tribe of Indians under a special act of Congress (set out in finding 1), conferring jurisdiction on this court to determine the claims of the Nez Perce Tribe of Indians, or any band thereof, arising under or growing out of the original Indian title, claim or right, including all rights growing out of treaties of June 11, 1855, and June 9, 1863. Plaintiff’s claim is that it was the exclusive owner of a tract known as the Wallowa Yalley, in what is now the State of Oregon, and that it was deprived of that land by the defendant without its consent and without compensa *19 tion. The claimed land is much more than the valley of the Wallowa Biver, as it includes all the land described in the Executive Order setting up the Wallowa Valley reservation hereinafter discussed.
The Nez Perce Tribe of Indians was made up of several separate bands, each with its own chief or chiefs. Geographically, they were divided into the Upper Nez Perces and the Lower Nez Perces. Joseph’s Band, so named after its chief at the time that the treaties here of interest were made, belonged to the Lower Nez Perces. This band at different times dwelt along the Salmon and Snake Bivers, on the Imnaha, and on the Grande Bonde near its mouth. They, with other Nez Perces, resorted to the valley of the Wallowa Biver and to nearby country in the summer for hunting, fishing, and grazing.
Until 1842 there had been no chief of the whole tribe. In that year an Indian known as Ellis was named head chief by the Lidian agent for the territory. Some time prior to 1855 an Indian named Lawyer had come to be recognized as head chief by most of the tribe and he was so treated by the Government’s commissioners in negotiating for the treaties of 1855 and 1868.
On June 11,1855, a treaty was concluded between the defendant and the Nez Perce Tribe of Indians, by which much of the land of the tribe was ceded to the defendant, the land not ceded being expressly reserved for a reservation for the Nez Perce Indians. The treaty was signed on behalf of the Indians by Lawyer and the chiefs of the various bands, including Joseph who was the third Indian signer. The land here claimed by plaintiff was included in the Nez Perce reservation of the 1855 treaty.
In 1863 another treaty with the Nez Perce Indians was signed, reducing the area of the reservation to a described area in what became the State of Idaho. Included in the land relinquished to the defendant by that treaty was the land described in the findings as the Wallowa reservation. Joseph refused to sign the treaty or to recognize it as binding upon him, disclaiming any authority in Lawyer or the other chiefs to act for his band. Joseph’s band and the followers of some other chiefs who had not agreed to the *20 treaty refused to move to the treaty reservation and continued to roam over the country as they had previously done.
In 1813, upon recommendation of the Commissioner of Indian Affairs, the President, by executive order, withdrew from entry the Wallowa area and set it aside as a reservation for the “roaming Nez Perce Indians.” However, the nontreaty Nez Perces continued to roam and made no attempt to establish permanent homes in the Wallowa reservation. In 1815 the President revoked his order of 1873 and restored the land covered by it to the public domain.
After the revocation in 1875 of the order reserving Wallowa from entry, white settlers moved in and conflicts ensued, with fatalities on both sides. Efforts were made to induce the younger chief Joseph, who had succeeded his father, and his band to1 move to the reservation of the 1863-treaty. These efforts seemed to be about to succeed when further fatalities occurred, defendant’s troops intervened, and open war followed. The Indians were finally captured in Montana in 1876, and were taken first to Oklahoma, and then in 1885 some to the Nez Perce Reservation in Idaho and some to the Colville Reservation in Washington.
Plaintiff’s contentions here are that Joseph’s band owned the Wallowa area, that plaintiff’s title was recognized by the treaty of 1855, that the treaty of 1863 could not and did not lawfully deprive it of its property because it did not consent thereto, and that it is entitled to compensation for the land taken; or in the alternative, that in the treaty of 1855 it obtained recognition of its title and surrendered the title to the Nez Perce Tribe generally, so that the tribe could and did, without Joseph’s consent, effectively cede-Wallowa to the defendant by the treaty of 1863, in which event plaintiff claims that it is entitled to receive its pro-rata share in the consideration paid to the Nez Perces and to receive compensation for the allotments in the Nez Perce Reservation which it should have been given and never obtained.
Plaintiff encounters at the outset the difficulty of establishing title to the Wallowa area in Joseph’s band, as distinguished from the tribe as a whole, a difficulty which its- *21 evidence does not overcome. Claim of title is based on its alleged immemorial possession of Wallowa. But it does not appear from the evidence that Joseph and his band ever had exclusive possession of the Wallowa area. What does appear is that Joseph and his band made their peculiar home at different periods in the region around the mouth of the Salmon, on the Snake Biver, on the Imnaha Biver, and on the Grande Eonde Biver near its mouth. The latter two locations are within the Wallowa area. In: the summer Joseph’s band went to the interior of the Wallowa area for the purpose of hunting, fishing, and grazing, but other bands of Nez Perce Indians regularly resorted there for the same purpose.
There was nothing in the treaty of 1855 which either recognized any title to the Wallowa area in Joseph’s band or gave to that band or any other band title to specific parts of the lands reserved to the Nez Perce Tribe by that treaty. Indeed the elder Joseph’s conduct in participating in the negotiation of and signing the treaty of 1855 shows that there must have been power in the tribe to act as a whole with reference to all lands of the tribe or any of its bands. If not, Joseph in that treaty would have been relinquishing lands which he and his band did not own, since none of the land now claimed to have been immemorially occupied by Joseph’s band was relinquished in! that treaty.
We conclude that the Nez Perce Tribe, as an entity, had the power to make the treaty of 1863 and that the dissenting minority, including the members of plaintiff band and the other nontreaty Nez Perces, was bound by that treaty.
Plaintiff does not, and could not, found its claim on the executive order of 1813. That order is offered only as a recognition of a title then existing in plaintiff. It was not such a recognition. It was for all the nontreaty or “roaming” Nez Perces, and not for Joseph’s band alone.
Plaintiff’s alternative claim for relief, viz, the right to a pro rata share of the Nez Perce tribal income and prop•erty under the treaties and agreements of the tribe with the United States, is not set forth in its petition, and is not properly before the court. Further, it is not proved that *22 such benefits were denied to any member of plaintiff’s band, because be was such a member, if he was willing to accept them.
In our consideration and decision of this case we have not been unaware of the fact that to assimilate the political organization of a tribe of Indians such as the Nez Perces at the time of the treaties here in question, to the political organization of white men, is a procrustean process. The tribal organization was, no doubt, loose and informal. The necessity for its becoming more definite, or being treated as if it were more conventional, according to white men’s standards, arose from the white man’s encroachments. There was no head chief of the tribe until the white men needed such a chief. It is probable, though, that the white man’s need was also the Indian’s need, once the white man had come. If “treaties” could not have been made, the alternative would no doubt have been worse for the1 Indians.
The treaties themselves, under consideration here, were by no means voluntary agreements between! equals. Perhaps treaties seldom are, or were, even as between white men, and even before the current plague of “treaties.” But the negotiations for the treaty of 1863, with the giving of presents, the reiterated protestations to the Indians of the Government’s unselfish motives, the cajoling and threatening of the dissident chiefs, and the complete insistence that the treaty be made as the Government desired it, and with no compromise, does not make pleasant reading. In these respects this negotiation probably did not distinguish itself among the numerous councils at which treaties with Indians were made.
This method, such as it was, was the Government’s then method of dealing with the Indians, and hence these treaties define the legal rights of the Indians and the Government. It follows that, though the discontent of Joseph and his brethren was natural and understandable, the present remnant of his band has no basis for suit.
The petition will be dismissed. It is so ordered.
JoNes, Judge; Whitakeb, Judge; LitteetoN, Judge; and Whaley, Chief Justice, concur.