The YUCHI (EUCHEE) TRIBE OF INDIANS et al. v. The UNITED STATES and the Creek Nation,

The Creek Nation East, Interpleader.
Appeal Docket No. 5–55.

United States Court of Claims.
Oct. 2, 1956.

Lewis M. Dabney, Jr., New York City, for appellants, Yuchi Tribe of Indians,

et al. J. T. Smith and Herbert S. French, Washington, D. C., were on the briefs.

Paul M. Niebell, Washington, D. C., for the Creek Nation, appellee.

Charles Bragman and C. LeNoir Thompson, Bay Minette, Ala., for the Creek Nation East, Interpleader appellee. Claude Pepper, Miami, Fla., Frank Horne and Hugh Rozelle, Atmore, Ala., were on the brief.

Ralph A. Barney, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for the United States, appellee.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

This is an appeal by the Yuchi (Euchee) Tribe of Indians et al., from an order of the Indian Claims Commission dismissing the appellant's claim for recovery in their own right of the value of certain land ceded to the United States Government by the treaties of August 9, 1814, 7 Stat. 120, and June 16, 1802, 7 Stat. 68, for which they claim no compensation was paid. The Indian Claims Commission in their Docket No. 21 (consolidated with this claim, Docket No. 172, for purposes of trial) allowed recovery by the Creek Nation of Oklahoma of the value of part of the land claimed that was ceded in 1814. The award was for the benefit of all the descendants of the Creek Nation as it was constituted in 1814 when the treaty of that year was made, and recognized by the United States in the treaty of cession of that year. Appellants being part of the Creek Nation as it was then constituted will share in the award to the Creek Nation.

The proceedings in the consolidated cases began on January 29, 1948, when the Creek Nation of Oklahoma, on behalf of descendants of the Creek Nation of 1814 now residing on the reservation in Oklahoma, filed its petition with the Commission to recover damages for the acquisition by the United States of 23,-267,600 acres of Creek lands in Alabama and Georgia by the above-mentioned 1814 treaty, sometimes referred to as the Treaty of Fort Jackson. The claimant alleged that the lands were acquired without compensation and contrary to the Government's obligation under the Indian Claims Commission Act, 60 Stat. 1049, 25 U.S.C.A. § 70 et seq., to deal fairly and honorably with the Indians. On January 5, 1951, the Creek Nation East moved for leave to intervene on behalf of descendant's of the Nation of 1814 living east of the Mississippi. This was denied by the Commission but their decision was reversed by this court, McGhee v. Nation Creek, 122 Ct.Cl. 380, and intervention was permitted on the ground that the injury alleged by the Creek Nation was in fact an injury to the entire Creek Nation as it was constituted in 1814, and the original claimant, The Creek Nation of Oklahoma, represented the interests of only those Creeks that resided as part of that nation in Oklahoma and did not represent the interests of Creeks otherwise situated. This court held, therefore, that any recovery should be in favor of all living descendants of the nation as it existed in 1814. Pursuant to this decision, an order allowing intervention was issued on December 21, 1953.

While action was pending in the McGhee case, supra, the Indian Claims Commission rendered an interlocutory judgment in favor of the original claimants on April 22, 1952, for the value of 8,849,940 acres of the original 23,267,-600 acres claimed to have been improperly acquired by the United States. The transfer of the balance was found to have been approved by the Indians at the time of the treaty. The Creek Nation v. United States, 2 Ind.Cl.Comm. 66.

On May 5, 1955, the Commission made additional findings and in accordance with the McGhee case decided that the award shall be for the benefit of all descendants of the Creek Nation as it was constituted in 1814 and recognized by the United States in the treaty of cession of that year. The Creek Nation v.

United States, 3 Ind.Cl.Comm. 455. On December 29, 1955, further additional findings were made and the amount of land on which the award was to be based was increased from 8,849,900 acres to 8,-986,653 acres, the actual dollar value of the award being withheld until a hearing on the value of the land as at 1814 could be had and a determination made. The Creek Nation v. United States, 4 Ind.Cl.Comm. 140.

The appellants, the Yuchi Tribe of Indians, petitioned the Indian Claims Commission, Docket No. 172, on July 27, 1951, for recovery of the value of 11,-200,000 acres of land ceded to the United States by the Treaty of Fort Jackson as well as for part of a cession made to the United States by the treaty of 1802. This land included the above referred to 8,986,653 acres of the 1814 treaty occupied by the friendly Lower Creeks, including the Yuchi, for which the Creek Nation of Oklahoma had been awarded a recovery by the Commission.

It also included land in Alabama lying to the west of that tract, and land in Georgia lying to the east of it and extending to the Atlantic Ocean. On this appeal, the Yuchi have abandoned their claim to separate ownership of a large part of the land originally sued for. Their claim is now limited to that portion of the land granted to the United States by the Treaty of Fort Jackson in 1814, shown on Royce's Map of Indian Cessions as that part of Cession No. 75, which lies east of the Flint River in Georgia, and that tract of land ceded by the 1802 treaty and shown on Royce's Map as part of Cession No. 44, being that part of Cession No. 44· which lies south of the Altamaha River and joins on the east the tract above mentioned.

On September 4, 1953, the Government moved to consolidate the two cases for trial on the ground that such was necessary to determine the question of ownership of the lands involved and to avoid multiple liability on the part of the United States. The motion was granted on December 21, 1953, and hearings were subsequently held which resulted in the above referred to findings of fact and opinion. Docket 172 in which the Yuchi Indians were the petitioners was dismissed by the Commission, it deciding that the Yuchi were, and still are, part of the Creek Nation; that the Yuchi never had any title to the lands in question; that the Creek Nation was the owner of the lands in 1814 and, therefore, the Yuchi had no cause of action in their own right. The Commission further held that since the Yuchi are descendants of members of the Creek Nation of 1814 and since any award for the lands ceded by the treaty of that year will inure to the benefit of all descendants of the nation as it was then constituted, the Yuchi Tribe will be protected by and be the beneficiaries of any award made in Docket No. 21. It is our opinion that in these conclusions the Commission was clearly right.

Pursuant to an agreement between the United States and the State of Georgia in 1802 whereby the United States promised to extinguish Indian title in Georgia as soon as possible, the United States entered into a treaty with the Creek Nation for a cession of a tract of land part of which is here put in question by the Yuchi. The treaty was sanctioned and approved by the Creek National Council and the Creeks were paid for the land ceded.

In about 1811, probably at the instance of the English who desired an alliance with the Indians in their forthcoming war with the United States, some of the Indians of the Creek Nation, contrary to the wishes of that nation, began terrorizing the whites and a civil war eventually erupted among the Creeks. After much prodding the United States Government finally entered the fray on the side of the recognized Creek Nation and ultimately defeated the hostiles. General Andrew Jackson in command of the victorious armies commenced a treaty convention on August 1, 1814, armed with authority from the Secretary of War of the United States to exact indemnification for the hostilities above referred to by cessions of lands

from the Indians for expenses incurred in the prosecution of the Indian war.

Under the threat of force, the general demanded from the 36 Creek Chiefs in attendance at the convention a huge tract of land in Alabama and Georgia all of which is represented by Royce's plat No. 75. Most of this land was that which was formerly occupied by the hostile group of Indians but a large part of the lower portion was occupied exclusively by the friendly Indians and was still governed by the Creek Nation. The fact that 35 of the chiefs present were friendly Creek Chiefs and only one was a hostile chief, and the fact that the Creek Nation, as such, was not at war with the United States but, rather, was an ally did not seem to bother General Jackson. The treaty as concluded ceded to the United States all of the land demanded by the United States. It was for this entire tract of land that the Creek Nation attempted to recover in their suit before the Indian Claims Commission. Claims for all that land that was formerly occupied by the hostile Creeks was denied because negotiations at the treaty conferences indicated that the friendly chiefs there present, that is, the representatives of the Creek Nation, felt that it was right for the Government of the United States to have that land as indemnification for expenses incurred in helping the loyal portion of the tribe. Since those friendly chiefs represented the wishes of the Creek Nation and since they in effect, agreed to give the land to the United States as payment for its aid, recovery was denied as to it. At the time of the treaty convention, the Indians protested formally and vigorously to General Jackson and to the Government of the United States the taking of the rest of the land but to no avail. It is this protested portion of the cession which the Indian Claims Commission in Docket No. 21, consolidated with this Yuchi case, decided was taken from the Indians unjustly by the Treaty of Fort Jackson and that the Creek Nation should be paid for it, the award to be for the benefit of the descendants of all members of the Creek Nation as constituted in 1814.

Signers of the treaty on the part of the Creek Nation included a representative of the Yuchi Tribe. Their representative also signed the written protest then submitted.

The substance of the Yuchi claim on this appeal is (1) that they, not the Creek Nation, were the owners of that part of the land ceded to the United States by the treaty of 1814 that was east of the Flint River, and that part of the land ceded to the United States by the treaty of 1802 that was south of the Altamaha River; (2) that title to the lands was *granted* to them by the treaties of Aug. 7, 1790, 7 Stat. 35, and June 29, 1796, 7 Stat. 56; (3) that since the lands that were part of the 1814 treaty were taken by threat of force, and since the Yuchi did not sign the treaty of 1802, hence, a cession without the owner's consent, they should recover the value of all these lands in their own right to the exclusion of the Creek national entity.

The Yuchi attempt to solidify their contentions by arguing that while they may have been part of the Creek Confederacy at all pertinent times in question, the confederacy, at least up until 1799, had no centralized government, it being in effect a group of self governing tribes banded together only for mutual defense with the result that title to the lands of the nation was in the constituent tribes themselves rather than in a central government, and that any action by the group had no binding effect on those tribes not assenting thereto.

Their argument continues that since there was no centralized government before 1790 or 1796, the treaties of those years, while purporting to be with the Creek Nation, were actually treaties between the United States and the individual tribes that were represented by the signatures on the documents and that, therefore, the grants contained in the treaties were to the individual tribes for the lands they then occupied. It is on this basis that the Yuchi claim all the land east of the Flint River as those

lands constituted their hunting grounds at that time. The Yuchi further claim that even before the treaties of 1790 and 1796, they had exclusive possession of their hunting grounds and were entitled to such through an agreement with the Creeks dating back to the time they first settled on Creek land. We cannot agree with these arguments. Clearly, we think the treaties were made with the Creek Nation as a whole.

The Yuchi also request reversal on the ground that the Commission erred in consolidating Dockets 21 and 172. We find no merit in this claim.

The scope of this court's jurisdiction on appeal from the Indian Claims Commission is to determine whether the findings of fact of the Commission are supported by substantial evidence, in which event they shall be conclusive, and whether its conclusions are in accordance with the law. In making this determination, the court must review the whole record, Indian Claims Commission Act, Sec. 20(b), supra. The substantiality of the evidence must take into account whatever in the record as a whole fairly detracts from its weight, Osage Nations of Indians v. United States, 97 F.Supp. 381, 119 Ct.Cl. 592; Universal Camera Corporation v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456. After thoroughly reviewing the record in this case, the court is of the opinion that the findings of fact and conclusion of law of the Commission are well supported by substantial evidence in the record as a whole, and therefore, this court affirms the decision of the Commission in Dockets 21 and 172.

To correctly evaluate the position taken by the appellants, the history of the Creek Nation in general and the Yuchi Tribe in particular must be looked to as well as the language of all the treaties involved and negotiations leading to them. This data as outlined below is part of the findings of fact of the Commission and is supported by substantial evidence in the record.

The Muscogee Tribes which originally formed the Creek Confederacy (later referred to as the Creek Nation) were the aboriginal owners of practically all of the lands which now constitute the States of Georgia and Alabama, including all the lands here in question, and were united into a confederacy at least as early as 1670. Within this confederacy, a distinction usually was made between the Upper and the Lower Creeks though they were both integral parts of the entity.

The Yuchi prior to the 18th Century occupied territory in Tennessee but early in that century left this territory and moved in among the Creeks with their consent and eventually settled generally among the Lower Creeks, the principal Yuchi town being located on the banks of the Chattahoochee River among the Lower Creeks. A group of Yuchi did, however, settle on the lower Savannah River in 1729. These settlements were all on aboriginal Creek soil with the permission of the Creeks.

The Commission in its findings of fact determined that at some time before 1751 the Yuchi were incorporated into the Creek Confederacy. In the opinion of the court, the Yuchi were a constituent part of the Creek Nation at least as far back as 1733 when the treaty of May 20, 1733, was entered into with Oglethorpe, Governor of the Colony of Georgia. While this treaty was not signed by the Yuchi it was made with and on behalf of the Creek Nation and ceded certain lands then occupied by the Yuchi to the crown. When terms of the treaty were later violated by some settlers, the Yuchi sent representatives to Oglethorpe to thank him for his subsequent action of clearing the Indian lands of the settlers and thereby living up to the treaty with the Indians. By such action, the Yuchi confessed themselves a part of the Creek Nation and undoubtedly considered themselves bound by treaties of that nation.

Upon being incorporated into the Creek nation, the Yuchi came under its general government and were subject to its laws though they were permitted to have their own chiefs, and have the right

of local self government as was the custom in all Creek towns. They lost their status as an independent tribe and became an integral part of the nation with the privilege of hunting anywhere within the domain.

The policies of the Creek Nation were set by the National Council that met irregularly but usually at least once per year. It was composed of the chiefs of the several towns constituting the Creek Nation, including the Yuchi Chiefs, though their attendance at the council was not compulsory. All decisions of the council were binding on the nation.

Originally title to lands within the domain was felt to be in the aboriginal Creek towns, but with the centralization of the Creek Government title was considered to be in the Creek Nation as a whole. Thereafter, land could be sold or ceded only with the consent of the Creek National Council. Sales or cessions could not be made by any chief or chiefs on their own even though the lands they desired to convey were part of their own town.

While it is generally agreed that title to Creek lands was in the Creek Nation after its centralization, there is, however, some uncertainty as to when the government became centralized. By 1799, it was certainly centralized as the evidence shows that in that year Colonel Benjamin Hawkins, United States Agent to the Creek Nation, called a general council of the Upper and Lower Creek Chiefs and persuaded them to accept a national form of government with regular council meetings. This government was successfully carried on thereafter. There is, nevertheless, definite evidence of centralization and council meetings long before this time, especially during the era of Alexander McGillivray, who was apparently the principal chief of the nation from about 1784 to 1793.

The above referred to treaty of 1733 is certainly indicative of centralization as the treaty was made by the Creek Nation on behalf of the constituent tribes who considered themselves bound by it.

In a subsequent treaty on August 21, 1739 with Oglethorpe, the Creek Nation declared that the lands therein described did by ancient right belong to the Creek Nation as tenants in common, American State Papers, 2 Indian Affairs 786–787 (hereinafter cited A.S.P., 2 I.A.). Appellant itself admits that all lands were nationally owned after centralization, thus this claim of national ownership of lands would tend to indicate centralization.

This position of national ownership of the lands and thus, centralization, was reasserted by the nation in 1786 when Alexander McGillivray speaking for the nation stated that a cession of lands of the Creek Nation could be made only by the "unanimous voice of the whole, as joint proprietors in common." A.S.P., 1 I.A. 18.

In a report by the United States Commissioners to the Indian Country to the Secretary of War on November 20, 1789, A.S.P., 1 I.A. 78, the Commissioners, in reporting on the nature of the government of the Creeks, stated as follows:

"7. Their kinds of government approach the qualified monarchy. In the towns, they have head-men, who are much respected, and have authority, both in peace and war, in their respective towns; in the districts, they have kings or chiefs, and warriors; the former have their influence in time of peace, and the latter in time of war. Upon all important occasions they meet in great council, and deliberate with freedom, particularly once a year, at the ceremony of the *first fruits*, called the *busking*, when they punish great delinquents, *regulate internal policy* [emphasis added] and form plans for hunting or war the ensuing season."

From these documented facts, there appears to be no doubt that there was a centralized Creek Government prior to 1790 and that its policies were regulatory on the whole nation. Since the Yuchi were a constituent part of the nation since at least 1733, they must be consid-

ered subject to the national laws since that time.

The above claims of title indicate that the nation long before the period of time in question owned, or claimed to own, all the lands of the domain as common property contrary to appellant's claim of the existence of tribal or *talwa* ownership. At least, since the time the Yuchi were incorporated into the Creek Nation the nation claimed this right of absolute sovereignty over all the lands of the domain. It was the law of the nation and the Yuchi being an integral part thereof were subject to it. This right of sovereignty was recognized by the United States in all its dealings with the Creeks and is evidenced by the treaties of 1790, 1796, 1802, 1805, and 1814, 7 Stat. 35, 56, 68, 96, 120, and the documentary evidence in the record of events and transactions leading up to the consummation of those treaties. All of these treaties were executed with the Creek Nation as such, after a meeting, and with the approval, of the council. The treaties of 1796 and 1814 and the protest to the treaty of 1814 were signed by Yuchi representatives. Since the treaties were dircted to, and signed by the chiefs, on behalf of and for the benefit of all the Creek Nation, the Yuchi by signing the treaties and the protest admit that there was a centralized Creek Government at that time and that they were a part of the nation as it then existed. This admission would also relate back to at least 1790 as the treaty of 1796 was an affirmance of the treaty of 1790 using almost identical language as respecting the contracting parties.

Further evidence of the centralized nature of the Creek Government prior to 1790 and of common ownership of all the lands by the central government is shown by the Creek Government's reaction to three treaties with the State of Georgia made during the 1780's by a few of the chiefs of various towns without sanction from the council. Those treaties—the Treaty of Augusta, November 1, 1783; the Treaty of Galphinton, November 12, 1785; and the Treaty of Shoulderbone on November 3, 1786—were subsequently disaffirmed by the Creek National Council since they were unauthorized. The State of Georgia was notified that the Creek Nation did not consider the treaties as binding on them.

As a result of this disaffirmance as well as a result of Georgia's insistence that the terms of the treaties and the cessions made therein be lived up to, many disputes and much bloodshed resulted between the Creeks on the one hand and the citizens of the State of Georgia on the other hand. The Creeks steadfastly maintained that the land purportedly ceded was theirs and fought to preserve it as part of their nation.

Because of these hostilities, the President of the United States, George Washington, intervened and appointed Commissioners to attempt to negotiate a treaty with the Indians. The Commissioners' first attempt failed because they attempted by their proposed treaty to have the Indians cede the very land that the Georgians claimed under the previous unauthorized treaties.

As the result of a subsequent invitation by President Washington asking the Creek Nation to send representatives to New York to settle the differences, the Creeks met in general council and appointed a delegation of 26 chiefs led by Alexander McGillivray to go to New York and represent the nation in negotiations leading to the treaty of 1790. The treaty was signed by representatives of the United States and by the 26 Creek delegates. The Yuchi did not have a representative at this convention and no representative of the Yuchi Tribe signed though it was binding on the Yuchi as they were part of the Creek Nation.

All of these events from 1733 to 1790 indicate conclusively that before 1790 when the treaty was executed, there existed a centralized form of government in the Creek Nation and that the Creek National Council had exclusive control over all the lands of the Creek Nation and alone had the power of disposition of them.

The language of the treaty itself and the negotiations that preceded it indicate without a doubt that the Creek Nation as an entity was the body with which the United States was dealing. The United States must have felt that the general council sufficiently regulated the internal affairs of the various tribes or it would have sought out the various tribes and attempted to have dealt with them separately. The treaty stated in part as follows:

"A Treaty of Peace and Friendship Made and concluded between the President of the United States of America, on the Part and Behalf of the said States, *and the undersigned Kings, Chiefs, and Warriors, of the Creek Nation of Indians, on the Part and Behalf of the said Nation.* * * *

"Article I. There shall be perpetual peace and friendship between all the citizens of the United States of America, *and all the individuals, towns, and tribes of the Upper, Middle and Lower Creeks and Semanolies composing the Creek nation of Indians.*

"Article II. *The undersigned Kings, Chiefs, and Warriors, for themselves, and all parts of the Creek Nation within the limits of the United States,* do acknowledge themselves, and the said parts of the Creek nation, to be under the protection of the United States of America, and of no other sovereign whosoever; and they also stipulate, that the said Creek nation will not hold any treaty with an individual State, or with the individuals of any State." (Emphasis added.)

The fact that the Indian signers spoke "for themselves and all parts of the Creek Nation within the limits of the United States" embodies within it the Yuchi tribe even though they did not have a signatory representative.

This control by the nation over all their lands and the existence of a cen-tralized government before 1790 is further illustrated by reports, letters and communications between the Indians and the United States representatives, and between various United States officials appearing in A.S.P., 1 I.A. at 15, 16, 22, 32, 78, and 79. Such contemporaneous data must be given much weight in determining the status of the Yuchi in relation to the Creek Nation at the time in question as well as it must be in determining the structure of the Creek National Government during the period of time in question. Snake or Piute Indians of Former Malheur Reservation in Oregon v. United States, 112 F.Supp. 543, 125 Ct.Cl. 241, 254.

There was subsequently a dispute over one of the articles of the treaty of 1790. McGillivray, at the time of the signing of the treaty, told the United States representatives that he did not know if he could get that particular article confirmed by the council. Disagreements resulted between the United States and the Creeks but later, after McGillivray's death, in general council, the Creek Chiefs said that they considered the treaty of 1790 as binding on them as "those men that went on there,[1] before the President of the United States, were invested with full power to make every thing that was done there binding on the whole Creek Nation." A.S.P., 1 I.A. 603. The treaty of June 29, 1796, more commonly known as the Treaty of Colerain, was then executed by the United States with the Creeks and was in effect an affirmance of the obligatory nature of the treaty of 1790 on the contracting parties. Representatives of the principal Yuchi town were in attendance at the treaty councils leading to the execution of the treaty and a representative of that town signed the treaty.

This treaty states in part:

"A Treaty of Peace and Friendship Made and concluded between the President of the United States of America, on the one Part and Behalf of the said States, *and the un-*

[1]. To New York.

*dersigned Kings, Chiefs and Warriors, of the Creek Nation of Indians, on the Part of the said nation.*

"The parties being desirous of establishing permanent peace and friendship between the United States and the said Creek nation, and the citizens and members thereof; and to remove the causes of war, by ascertaining their limits, and making other necessary, just, and friendly arrangement; the President of the United States, by Benjamin Hawkins, George Clymer and Andrew Pickens, Commissioners whom he hath constituted with powers for these purposes, by and with the advice and consent of the Senate; and the Creek Nation of Indians, *by the undersigned Kings, Chiefs, and Warriors, representing the whole Creek Nation, have agreed to the following articles:*

"Article I. The Treaty entered into at New-York, between the parties, on the 7th day of August, 1790, is, and shall remain obligatory on the contracting parties, according to the terms of it, except as herein provided for. * * *" (Emphasis supplied.)

The language above quoted plus the fact that the treaty was confirmed by the national council further indicates the sovereign quality of the Creek Nation. The fact that the Yuchi signed is their admission that the council was their sovereign and that they were subservient thereto. Thus, the Yuchi claim that the Creek Government was not centralized until much later is proved to be in error as well as is their contention that there existed individual tribal ownership rather than national ownership.

█ The Yuchi, nevertheless, claim title to the lands and insist that that title was *granted* to them by the treaties of 1790 and 1796. They contend that since the title was not divested before the cessions of 1802 and 1814, they are entitled to recover for the value of the lands thereby ceded. The fallacy of this argument is shown merely by looking to the

language of the treaties of 1790 and 1796, and we cannot, therefore, agree with the Yuchi's contentions.

A merely cursory reading will show that there are no words of *grant* contained anywhere therein. The purpose of the treaty of 1790 was to establish the boundaries of the Creek Nation. Once established the United States *guaranteed* that all the Creek lands thus defined would be protected. The treaty *granted* nothing to the Yuchi, the Creeks, or anyone else. Article 5 of the treaty of 1790 provides for this guarantee:

"Article 5. The United States solemnly *guarantee to the Creek Nation,* all their lands within the limits of the United States, to the westward and southward of the boundary described in the preceding article." (Emphasis supplied.)

Since this guarantee was affirmed by the treaty of 1796, it is unmistakable that no title was *granted* to anyone by the treaties of 1790 and 1796. Even if there was a grant, it would have been to the Creek Nation since, as pointed out above, the United States was dealing only with that centralized unit, and not with all the signers individually as claimed by the appellant. It was fully recognized by the United States that the Creek Nation was and had been the owners of the lands.

On the other hand, if there was a grant contained in the 1790 treaty it still could not have been to the Yuchi even if the United States was dealing with all the signers individually which is the substance of the Yuchi argument. The Yuchi did not sign the 1790 treaty and the treaty of 1796 was simply a reaffirmation of the 1790 document. Any grant contained therein could not have been to a non-signer. The later treaty provides only that the earlier one shall remain obligatory on the "contracting parties." The Yuchi were not a contracting party to the 1790 treaty, therefore, anything contained in it would not affect them. Since the balance of the language of the treaty of 1796 does not refer to the lands in question there is no possible way the Yuchi could claim a grant of land to them

even if the treaty of 1790 or the treaty of 1796 made a grant—this by the appellant's own argument.

Since aboriginal title to the land in question was in the tribes that originally formed the Creek Confederacy (Nation), that title passing to the Nation upon its centralization, and since there was no grant to the Yuchi in the treaties of 1790 and 1796 and could have been none as the United States did not own the land, and since the Yuchi did not own the land in their own right at any time, let alone at the time of the cessions of 1802 and 1814, their claim for recovery is a thing of naught and must be denied.

■■ While not necessary for the decision of this case, the remaining claim of the appellant to the land will be discussed, that is, their claim of a right of exclusive possession of their own hunting grounds which they allegedly obtained by agreement with the Creek Nation when they first settled there. They contend that, in this respect, they differed from other tribes of the nation and were in a special position within it. In support of this contention appellant had their current Chief testify as to his talks with the old people of the tribe, and of tribal tradition to the effect that exclusive possession of the hunting lands was in the Yuchi to the exclusion of everyone. The Yuchi also, in support of this allegation, point to the writings of William Bartram who states that:

"Every individual inhabitant has an equal right to the soil and to hunt and range over this region,[2] except within the jurisdiction of each town or village, which I believe seldom extends beyond its habitations and planting grounds. *Perhaps the Uches are to be excepted. They claim an exclusive property by right of a contract or treaty made when they entered into alliance with the Muscogulgees;* but though they sometimes put the Creeks in mind

of this privilege, when their hunters make too free with their hunting grounds, yet the dispute seldom goes further, as the Confederacy are cautious of offending the Uches, and yield to their common interest and safety." [Emphasis supplied.] Bartram, Observation of the Creek and Cherokee Indians 22.

Bartram's writings, however, were, by his own admission, only observations and conjecture, Bartram, op. cit. supra at 22, thus, *title* to the lands claimed by the Yuchi could not be proven by the above excerpt alone, and the Yuchi do not claim such on the basis of the above. They point out the statement only as being evidence of their right of exclusive *possession* to their hunting grounds. Exclusive *possession*, however, does not constitute *title* to lands where there is a higher national government. The appellant, in effect, admits this as in its brief at page 7 it states as follows:

"In reading our summary of this evidence we ask the Court to keep in mind that such evidence is presented not to show *aboriginal* Indian title to the land sued for (which, in our opinion, neither the Yuchi nor the Creeks have proven) but to show the relation of the Yuchi and the Creeks in 1790 and 1796, and thus establish under *Ottawa*[3] that title to the land sued for was *granted* to the Yuchi by the treaties of those dates." (Italics theirs.)

This is, in effect, a concession by appellants that the Yuchi did not get title as a result of their exclusive possession (and we do not decide that they did have exclusive possession), and that they did not have *title* before 1790. The true relation of the Yuchi and the Creeks as well as the claim of grant has already been dispensed with and nothing more need be said.

We do not feel that it is necessary to go into the applicability of the Ottawa case

2. "this region" refers to the Creek Nation.

3. The Ottawa Tribe of Indians, et al. v. United States, 2 Ind.Cl.Comm. 461.

other than to say that the basic facts are at variance with those in this case. In that case, the facts failed to show that there was a chief of the entire nation or a general council of the entire nation of the Ottawas having control over all the lands. The facts did show, however, that the various bands of Ottawas had the authority to dispose of the land they occupied, this even though other bands of Ottawas may have had some interest therein. The facts of the case at hand show the contrary, that is, that there was a centralized Creek Government, that there was a national council which regulated internal policy, and that land could be conveyed or ceded only with the council's approval. Therefore, the decision in the Ottawa case that treaties made with the "Ottawa Nation" were with the individual tribes signing thereto is inapplicable here.

While the Yuchi are not entitled to any indemnification in their own right, they will participate in any award made in Docket No. 21 as compensation for the property taken unjustly by the treaty of 1814. As the cession of 1802 was made with the consent of the national council and the Indians were compensated for it at the time of the cession, there can be no recovery as to it in either Docket Nos. 21 or 172.

The only remaining issue to be discussed is the appellant's assertion that the Indian Claims Commission erred in allowing consolidation of Docket Nos. 21 and 172 for purposes of trial. The only thing that need be said respecting this is that since a situation existed whereby two groups were laying claim to the same land, The Creek Nation in Docket No. 21, and The Yuchi Tribe of Indians in Docket No. 172, the Commission correctly consolidated the cases as such was necessary to determine who actually owned the land during the period of time in question and to avoid the possibility of multiple liability on the part of the United States.

The findings and conclusions of the Indian Claims Commission are in all respects affirmed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER, Judges, concur.