The **POTTAWATOMIE NATION OF INDIANS et al., Appellants,**

v.

The **UNITED STATES and Hannahville Indian Community et al., Appellees.**

**Appeal No. 6–73.**

United States Court of Claims.

Dec. 18, 1974.

854

Robert S. Johnson, attorney of record, Topeka, Kan., for Pottawatomie Nation of Indians, and others, appellants.

Louis L. Rochmes, attorney of record, for Citizen Band of Potawatomi Indians of Oklahoma, and others. Jack Joseph, Chicago, Ill., of counsel, for appellants.

Richard L. Beal, Washington, D. C., with whom was Asst. Atty. Gen. Wallace H. Johnson, for the United States, appellee.

Robert C. Bell, Jr., attorney of record, New Canaan, Conn., for Hannahville Indian Community, and others, appellees.

Before COWEN, Chief Judge, and NICHOLS and BENNETT, Judges.

ON APPEAL FROM THE INDIAN CLAIMS COMMISSION

BENNETT, Judge:

The issue in this case, heard on appeal from orders of the Indian Claims Commission, is whether all Indians of the Pottawatomie tribe, or only certain groups thereof, should share in any award by the Commission of additional compensation for lands ceded by Pottawatomies under the treaty of October 20, 1832, 7 Stat. 378. Appellants would restrict the award to certain "bands"; appellees Hannahville Indian Community, et al., would have all Pottawatomies share.[1] Appellee United States has no financial interest in the outcome and consequently has taken no position. A majority of the Commission has held that all Pottawatomies should share.[2]

There is no dispute that any eventual award by the Commission is to be made to that body of Indians which actually owned and ceded land to the United States under the treaty of October 20, 1832. Of necessity therefore, appellants, who claim that only a portion of the Pottawatomie tribe should share in any award, contend that only a portion of the tribe owned and ceded the land. Appellees Hannahville Indian Community, et al., argued successfully before the Commission that the whole Pottawatomie tribe or nation owned and ceded the land.

In arriving at the decisions from which this appeal is taken, the Commission endeavored to follow the instructions given it by this court in a related case, Hannahville Indian Community v. United States, 180 Ct.Cl. 477 (1967). The Hannahville case, though concerned with treaties other than the one we consider herein, presented the same question of fact—namely, whether land purchased by the United States was owned and

1. Appellants claim to be descended from that band or bands of Pottawatomies which, appellants contend, were the ceding party in the October 20 treaty. Appellees Hannahville Indian Community, et al., make no such claim and would share in any award only if all Pottawatomies shared alike.

2. 27 Ind. Cl. Comm. 187 (1972). The decision was by a majority of three, two commissioners dissenting in an extended minority opinion.

ceded by all or only a portion of, the Pottawatomie nation. In that case, as here, the Prairie and Citizen bands of Pottawatomie Indians contended that the respective treaties were made with autonomous "bands" of Pottawatomies, while the Hannahville Indian Community argued that the Pottawatomie tribe was a single political entity which owned all lands in common. Because the Commission had failed to do so in the first instance, we returned the case to it with instructions to "make a de novo determination of the political structure of the Potawatomi Indians at the times when the United States negotiated the various treaties with them giving rise to the claims asserted * * *." 180 Ct.Cl. at 486.

In response to these instructions, the Commission consolidated the remanded dockets with other dockets (including those presently under consideration), and in one large proceeding sought to "resolve the question of the political structure of the Potawatomi Indians during the period 1795–1833 * * *." 27 Ind. Cl. Comm. at 188. The Commission defined the question for decision as "whether the Potawatomis were negotiating the treaties during that period as a single land-owning entity * * * or as several separate autonomous groups * * *." *Id.* The majority of the Commission concluded that, in all treaties during the period 1795–1833 in which Pottawatomies ceded lands to the United States, including the treaty of October 20, 1832, the tribe acted as a single entity, ceding lands owned by all the Pottawatomies in common.

 The question decided by the Commission, and on appeal here, is one of fact. By statute[3] we are limited to a determination of whether such a factual finding is supported by substantial evidence on the record as a whole. If so, it is conclusive. That we might have reached a contrary result on the evidence is then of no consequence. Seminole Nation of Oklahoma v. United States, 498 F.2d 1368, 204 Ct.Cl. 655

(1974); Hannahville Indian Community v. United States, *supra,* 180 Ct.Cl. at 486 n. 10; Sac & Fox Tribe v. United States, 315 F.2d 896, 906, 161 Ct.Cl. 189, 207, cert. denied, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963). The evidence before the Commission in this case included hundreds of historical documents—treaties, journals of treaty negotiations, reports of Indian agents and commissioners, correspondence of the Department of War, and congressional appropriations, among others—and testimony by experts in Indian affairs. The evidence occasionally points in more than one direction; it cannot always be harmonized in one theoretical framework. After careful consideration of this evidence, however, we have concluded, and we hold, that the ultimate factual determination of the Commission—that the Pottawatomie tribe was a single land-owning entity during the period 1795–1833— is supported by substantial evidence and is, therefore, conclusive on the court. It follows that the land ceded by treaty of October 20, 1832, was not, as appellants urge, owned and ceded by an autonomous band or bands of Pottawatomies.

We now review the evidence which was relied upon by the Commission, and which we find to be substantial. Though, as the Commission states, "the answer lies primarily in the treaties themselves,"[4] we find it helpful to consider first the historical background and anthropological evidence (expert testimony), because this information leads to a better understanding of the individual treaties.

During the first half of the eighteenth century, the French fur trade prospered in the region of the Great Lakes, and a series of trading posts marked a continuous route south from the Great Lakes through the valleys of the Wabash and upper Mississippi Rivers. There were virtually continuous waterways from the western shores of Lake Michigan to Detroit either through the Straits of Mackinac (northern route) or along the St. Jo-

---

**3.** 25 U.S.C. § 70s(b) (1970).

**4.** 27 Ind. Cl. Comm. at 192.

seph and other rivers (southern route). It was along these main avenues of communication that the majority of Pottawatomie settlements were located. As a result of their strategic locations, the Pottawatomies were able to move with relative ease among their communities. This travel was a unifying force; correspondence and treaties in the first half of the nineteenth century show that Pottawatomies in the Detroit area kept in contact with members of their tribe in settlements in western Michigan, Indiana, Illinois, and Wisconsin. Two deeds of land by the Indians prior to the 1795–1833 period, with which we are directly concerned, tend to show Pottawatomie unity in the late 1700's. Under a deed of July 6, 1776, the chiefs of the Pottawatomies, by and with the consent of the whole nation, granted, as a gift, Grosse Isle, situated at the mouth of the Detroit River where it empties into Lake Erie. By deed of May 15, 1786, land on the Raisin River was given by the chiefs of the Pottawatomie nation of Detroit "with the advice and consent of and in the name of the entire nation."

At the Commission's *de novo* proceeding, three expert witnesses testified, all for appellees Hannahville Indian Community, et al. The witnesses were anthropologists and/or ethnohistorians, and all held teaching positions in midwestern universities. These witnesses were unanimous in their belief that during the period 1795–1833, lands ceded by the Pottawatomies in the various treaties were owned and ceded by the whole nation as a single political entity. Skillful cross-examination of these witnesses revealed that their preparation for the hearing was somewhat abbreviated and that they had perhaps a greater knowledge of Indian affairs in general than of the particular Pottawatomie political structure during the years 1795–1833. Nevertheless, we feel that the Commission was entitled to rely on that expert testimony in support of its conclusions with regard to the treaties themselves.

■ Other witnesses had testified in various earlier Pottawatomie proceedings

to the effect that the Pottawatomie tribe was divided into politically autonomous bands. The Commission majority gave short shrift to this testimony, obviously finding more credible the testimony of appellees' witnesses. Such a choice among witnesses is entirely proper and is in fact an important function of the Commission, the stautory fact-finding body in these cases. The statement by the Commission that only appellees' witnesses were "shown to be expert in the matter here at issue" does not suggest that the other witnesses' testimony was ignored. On the contrary, the majority's findings of fact include a summary of the autonomous band theory championed by appellants' witness Dr. Wallace.

■ According to the expert testimony believed by the Commission, the Pottawatomie tribe, though consisting of many communities with local chiefs and functionaries, had an overall structure with a single, hereditary "principal chief" named Topenebee. During the period 1795–1833 there were in fact two Topenebees, father and son. The evidence shows that in 1833 a chief of the Pottawatomies in the Chicago-Milwaukee area referred to Topenebee, who lived in southwest Michigan, as the principal chief of all Pottawatomies, a position inherited from his deceased father. Topenebee's rank is borne out by his signature on several of the treaties during the period 1795–1833. In no less than five treaties he was described as "principle chief of the nation," "principal chief of the Potawatamie tribe of Indians," or by another similar title. Appellants and the Commission minority argue that Topenebee was in fact chief only of the "St. Joseph band" of Pottawatomies, and that if the United States, which drafted the treaties, thought otherwise, it was misinformed. While we do not accept these contentions, we note in any case that we have previously held that if the United States deals with a tribe as a unit, the tribe is bound by its treaties as a unit, regardless of whether a particular band may view itself as politically independent. Joseph's Band of the Nez

Percé Tribe v. United States, 95 Ct.Cl. 11 (1941). The references to Topenebee's rank, and other treaty evidence discussed *infra*, indicate that the United States believed it was obtaining title to lands ceded in the various treaties from the Pottawatomies acting as a nation.

Pottawatomie Indians were classified by the experts as "Central Algonquin" Indians, distinguishable from "Northern Algonquins" such as the Chippewas and Ottawas. Central Algonquin Indians tended to be more highly organized politically and had a more centrally organized tribal structure.

The first of the treaties with the Pottawatomies during the 1795–1833 period was the Treaty of Greenville, 7 Stat. 49 (1795), and the Commission attaches special significance to it. The Treaty of Greenville was negotiated between the United States and 12 tribes of Indians, including the Pottawatomies. Its purpose was to set an overall boundary between Indian and "white man's" lands; it did not set any boundaries among the Indians themselves. Under the treaty, the United States recognized the Indians' title to an area "lying north of the Ohio River, east of the Mississippi River, and west and south of the Great Lakes and the waters uniting them, according to the boundary line agreed on by the United States and Great Britain in the Treaty of 1783, * * *." [5]

There is no dispute that the 240 Pottawatomies present at Greenville represented all of the groups or communities of Indians in the tribe. Appellants assert, however, that the various chiefs were there as representatives of five autonomous bands of Pottawatomies rather than as representatives of one land-owning tribal entity. The Commission found otherwise. Our examination of the evidence, which is, frankly, mixed, leads us to conclude that the Commission's finding is supported by substantial evidence and must be upheld. The Commission was particularly influenced by the United States consistent references, in the treaty language itself as well as in the negotiations preceding the agreement, to the Pottawatomies as a tribe. At the conclusion of the negotiations, for example, the United States negotiator, General Anthony Wayne, asked each tribe whether it was prepared to sign the treaty; when he called out "Pottawatomies," they responded unanimously and in unison, "yes."

While we uphold the Commission in its determination that the Pottawatomie tribe as a unit agreed to the Treaty of Greenville, and that the United States considered itself as dealing with one tribe in the negotiations, we do not agree with a second, essentially legal, inference drawn by the majority from that agreement. The majority states that because the entire Pottawatomie tribe acted as a unit at Greenville, future treaties would "in the ordinary course, encompass the interest of the whole tribe," appearances to the contrary notwithstanding.[6] We find this inference less than persuasive because, so far as the evidence shows, the Treaty of Greenville did not affect the Pottawatomie land-holding *status quo*. There is, in other words, no indication that any group or band of Pottawatomie Indians was required, as a result of the treaty, to give up lands it then occupied. Because no land interest of any particular group or band of Pottawatomies was sacrificed, there was no cause for such a group to assert any independent rights at Greenville. Thus, the fact that the United States dealt with the Pottawato-

---

**5.** Miami Tribe of Oklahoma v. United States, 175 F.Supp. 926, 930–931, 146 Ct.Cl. 421, 429 (1959). In *Miami Tribe* we discuss the Treaty of Greenville in detail.

**6.** 27 Ind. Cl. Comm. at 194. The majority cites Yuchi Tribe v. United States, 145 F.Supp. 206, 136 Ct.Cl. 433 (1956), cert. denied, 352 U.S. 1016, 77 S.Ct. 558, 1 L.Ed.2d 546 (1957), in support of its inference. In

*Yuchi Tribe* we held that the Yuchi tribe of Indians was part of the Creek nation and was bound by Creek nation treaties. We did so because certain acts of the Yuchis demonstrated their allegiance to the nation. In the instant case, however, for reasons explained *infra*, we do not feel that Pottawatomie unity was irreversibly established by the Greenville Treaty. The facts differ in these cases.

mies as one nation at Greenville was not conclusive on subsequent treaties. Nevertheless, we believe that the subsequent treaties and treaty events establish in their own right the unified political structure of the Pottawatomie nation.

The Commission discusses some 11 treaties in addition to the treaty of October 20, 1832, the focus of our present inquiry. It is not possible or necessary to examine each treaty fully in this opinion; our intent is rather to be selective, highlighting those treaties and facts which most clearly show the Commission's decision is indeed supported by substantial evidence.

Under the treaty of November 17, 1807, 7 Stat. 105, the "Pottawatamie nations of Indians" and other Indian nations ceded Royce Area 66 in southeastern Michigan and northwestern Ohio. Article II of the treaty provided for payment of $1,666.66 to the "Pottawatamie nation." An annuity of $400 was provided to "such of the Pottawatamies, as now reside on the river Huron of lake Erie, the river Raisin, and in the vicinity of the said rivers." Though the land ceded was occupied by only one group[7] of Pottawatomies, the entire nation received the $1,666.66 payment. The $400 annuity provided for the portion of the nation which actually was living on the cession was, the Commission reasonably concluded, recognition of the local interest or special loss of that lesser group. We have in this treaty, therefore, an element missing in the Treaty of Greenville: a cession of land occupied by only one group of Pottawatomies, where the United States nevertheless recognizes a national or overall interest of the tribe.

By treaty of October 2, 1818, 7 Stat. 185, the Pottawatomies ceded Royce Area 98 in west-central Indiana and east-central Illinois, as well as all land south of the Wabash River. Although the cession was located in an area occupied, according to the appellants' terminology, by the Prairie and Wabash bands, the treaty was signed by Pottawatomie chiefs representing all parts of the tribe. Furthermore, the United States pledged in Article 3 to pay the "Potawatamies" a permanent annuity of $2,500, one-half to be paid at Detroit, the other half at Chicago. Both Detroit and Chicago lie outside the areas then inhabited by the Prairie and Wabash bands.

The pattern continues in the treaties of August 29, 1821, 7 Stat. 218, and October 16, 1826, 7 Stat. 295. The 1821 treaty involved Royce Area 117 in Michigan and Indiana, but the negotiations were held at Chicago, and Pottawatomie signatories included chiefs from the Chicago area. The treaty recognized Topenebee as "principal chief of the Potwatamie nation," and the United States obligated itself to pay the "Potawatamie nation" a $5,000 annuity. Royce Areas 132 and 133, ceded under the 1826 treaty are located in Indiana, but signatories to that treaty included chiefs from all Pottawatomie communities. Topenebee was again recognized as principal chief. The United States, among other things, agreed, in Article 3, "to pay to the Potawattamie tribe, an annuity of two thousand dollars in silver, for the term of twenty-two years, * * *."

Before turning to the October 20, 1832 treaty, we would note that the pattern of dealings between the United States and the Pottawatomie tribe, as recounted above, is similar to that which we found in Joseph's Band of the Nez Percé Tribe v. United States, supra. The Nez Percé tribe was made up of several bands, including one known as Joseph's band, named after its chief. Some time prior to 1855 an Indian named "Lawyer" had come to be recognized as head chief by most of the tribe and was so treated by the United States in negotiating certain treaties of 1855 and 1863. The treaty of 1855 was signed by Lawyer and other chiefs, including Joseph. This treaty did not, however, cede any of the

---

7. Appellants refer to this group as the "Huron band."

lands claimed by Joseph. By treaty of 1863 more land was ceded to the United States; the treaty was signed by Lawyer, but Joseph and some other chiefs refused to sign or recognize the treaty. We held that Joseph and his band were bound by the 1863 treaty. Joseph's participation in the 1855 treaty, in which his own lands were not involved, indicated, we held, that there was a power in the tribe to act as a whole with reference to all lands.

■ We have seen that the United States and Pottawatomies recognized Topenebee as the principal chief, and further that many Pottawatomie chiefs signed treaties in which none of the lands occupied by their bands were among those ceded. The Commission is therefore justified in finding that where, in some instances, a portion of the Pottawatomie nation appears to claim an independent interest in land it occupies, the land is, in fact, owned by the tribe as a whole, and any treaty should be interpreted consistently with that fact.

In October of 1832 three treaties were signed at Camp Tippecanoe, Indiana. The preamble of the first treaty, that of October 20, states that the parties to the agreement are the "United States" and the "Chiefs and Headmen of the Potawatamie Tribe of Indians of the Prairie and Kaukakee." In Article I, the "said Potawatamie Tribe of Indians" ceded to the United States what we now refer to as Royce Area 177, located in Illinois southwest of Chicago. Article II provided reserves of land for certain individual Indians. In consideration of the cession, the United States agreed in Article III to pay the "aforesaid Potawatamie Indians, an annuity of fifteen thousand dollars for the term of twenty years." Indians Billy Caldwell, Alexander Robinson, and Pierre LeClerc were also promised annuities during their natural lives. Article IV provides, *inter alia*, that the "said tribe" would be permitted "to hunt and fish on the lands ceded, as also on the lands of the Government on Wabash and Sangamon rivers, so long as the same shall remain the property of the United States."

Appellants interpret the preamble of the treaty literally, asserting that the real party in interest on the Indian side was the Pottawatomie tribe "of the Prairie and Kaukakee," *i. e.*, the "Prairie band." There are contemporaneous documents which tend to support this interpretation, the most powerful of which is a report of treaty commissioners dated December 6, 1832. The report states in part:

> Commencing our negociations (sic), with the Pottawatomies, there seemed to be, a local interest claimed by different bands; in relation to their relative rights to the soil, not well to be adjusted without seperate (sic) Treaties. With those of the prairie, we have therefore negociated (sic) a treaty, by which, they have ceded, their right of soil in the State of Illinois, east of the Rivers, Plein and Illinois; * * *.

In spite of this report, however, the United States appeared to recognize the national, in addition to the local, interest of the Pottawatomie Indians. Though the treaty ceded land allegedly occupied by the Prairie band, signatories to the treaty included chiefs from the Chicago-Milwaukee and Indiana areas which, according to the autonomous band theory, were occupied by the United Nations band and Wabash band. The participation by the Indiana chiefs might possibly be explained, and the minority attempts to do so, by the fact that the treaty negotiations were held in Indiana. However, the participation by chiefs from the Chicago-Milwaukee area, which cannot be similarly explained, fits the pattern we have seen in earlier treaties. Moreover, those Chicago-Milwaukee chiefs were not just "along for the ride"; the United States officially recognized their interests by granting certain of them individual reserves of land.

Two other treaties emerged from the October meetings at Camp Tippecanoe:

those of October 26 and October 27, 1832. They have a bearing on the October 20 treaty because the Commission viewed the three as complementary to one another, in effect constituting a single transaction. By treaty of October 26, 1832, 7 Stat. 394, "Chiefs, Headmen and Warriors, of the Pottawatimie Indians" ceded Royce Area 180 in northwestern Indiana, to the east of and contiguous with, Royce Area 177 ceded on October 20. The signatories to the treaty consisted solely of chiefs from Indiana. The October 27 treaty, 7 Stat. 399, was concluded by the United States and "Chiefs and Warriors of the Potowatomies, of the State of Indiana and Michigan Territory." Under Article I, those Indians ceded "their title and interest to lands in the States of Indiana and Illinois, and in the Territory of Michigan, south of Grand river." Among the Indian signatories was principal chief Topenebee. Unlike the October 20 and October 26 treaties, the October 27 treaty did not cede land by metes and bounds, but by a general quitclaim. It is agreed that the end result of the treaty was the cession of Royce Area 181 in Indiana.

■ The Commission's determination that all three of the October 1832 treaties constituted a single transaction is based upon various contemporaneous documents, the majority of which we find subject to more than one interpretation. A statement made by an Indian trader named George W. Ewing in a deposition of October 1, 1862, is however, of interest. He deposed that one of the Indian agents present at Camp Tippecanoe, General John Tipton, was reported to have stated on October 26, 1832, that the treaties of October 20 and 26 would be for naught unless the United States entered into a third treaty in which the United States could obtain the "national right" of the Pottawatomies in the lands ceded by those earlier treaties. Tipton's alleged statement might tend to explain why the October 27 treaty was a broadly described quitclaim cession, rather than a cession by metes and bounds. How-

ever, Ewing's deposition, which is double hearsay and 30 years after the fact, can be given little weight. In sum, we are not convinced that the three treaties constituted one transaction; nevertheless, we do not think that the "one transaction" finding is essential to the Commission's conclusion that the October 20, 1832 treaty cession, like all others in the 1795–1833 period, was by the Pottawatomie tribe as a single land-owning entity.

■ Further reference should be made to the annuity payments made by the United States to the Pottawatomies pursuant to the various treaties we have been discussing. The identity of the recipients of the annuities, and whether the annuities were paid according to "bands" or distributed to all Pottawatomies *per capita*, are questions, the answers to which would be significant in assessing whom the United States viewed as treaty parties. The Commission cites evidence which it believes indicates that the payment of annuities was to all Pottawatomies on a *per capita* basis. Appellants and the Commission minority dispute the majority's interpretation of the evidence. The minority concludes that "[a]t this late date it is impossible to ascertain how, on what basis, or to whom annuities under Potawatomi treaties were actually paid during much of the period from 1817 through 1856." [8]

While we can understand the reasons which led the minority to the above conclusion, we also believe that the Commission's more positive conclusion is supported by substantial evidence and must be upheld. Two examples should suffice. H.R.Exec.Doc. No. 61 is an 1869 report by Indian commissioners of Pottawatomie claims under the various treaties to which the Pottawatomie nation was a party. The report was referred to the Committee on Indian Affairs and ordered to be printed. The major part of the document is a listing of payments made on a treaty-by-treaty basis. The document uses the terms "Pottawatomie Indians" and "Pottawatomie Claims"; nowhere is there an indication that pay-

---

8. 27 Ind. Cl. Comm. at 459.

ments were made to a band or bands of Pottawatomie Indians. A second document is a letter of April 16, 1825, by Lewis Cass, who during his career was Superintendent of Indian Affairs at Detroit, Governor of Michigan Territory, Commissioner of Indian Affairs in the War Department, and Secretary of War. He wrote in the letter that annuities were the "consideration paid by the United States for valuable cessions made by the Indians in their national character."

■ We reject the contention of appellants that the Commission somehow violated this court's mandate in Hannahville Indian Community v. United States, *supra*, by determining that the Pottawatomies formed a single political unit during the period 1795–1833. We were aware in *Hannahville* that the Commission had previously found, in an order involving different treaties and different lands, that the Pottawatomies were divided into autonomous bands. We held that those findings were not *res judicata* on the issue in the instant case. We have no reason to believe that the Commission ignored, in its more recent decision, the evidence it relied upon for its earlier determination. It is clear that, with the benefit of the additional expert testimony taken in the *de novo* hearing, the Commission reassessed the documentary evidence and arrived at a different conclusion.

To conclude, we affirm the Commission's determination that during the period 1795–1833, the Pottawatomie nation was a single land-owning, political entity. We hold that lands ceded under the treaty of October 20, 1832, were owned and ceded by that Pottawatomie nation.

Affirmed.