## MOLE LAKE BAND et al. v. UNITED STATES et al.
### No. 45162 (II).

United States Court of Claims.
Feb. 7, 1949.

Jay H. Hoag, of Duluth, Minn. (Verne R. Edwards, of Superior, Wis., G. Arthur Johnson, of Ashland, Wis., and Clarence G. Lindquist, of Duluth, Minn., on the brief), for plaintiffs.

Clifford R. Stearns, of Washington, D. C., and A. Devitt Vanech, Asst. Atty. Gen., for defendants.

Before JONES, Chief Judge, and MADDEN, HOWELL, WHITAKER and LITTLETON, Judges.

MADDEN, Judge.

On August 30, 1935, Congress authorized the Chippewa Indians of Wisconsin to sue the United States in this court. Act Aug. 30, 1935, 49 Stat. 1049. On April 1, 1940, the Indians filed a petition, No. 45162, which included all their claims. On February 1, 1945, by leave of the court, they separated out of their original case the subject matter of this case, by filing a sep-

arate amended petition No. 45162(II). As shown by the amended petition and by statements of record in the trial of this separate case, the only bands of the Chippewas of Wisconsin which are interested in this case are the Lac du Flambeau band and the Bad River, otherwise known as the La Pointe, band. The object of the suit is to recover for timber asserted to have been wrongfully taken by third persons from nine sections of land, three on the Lac du Flambeau Reservation and six on the Bad River Reservation, in the State of Wisconsin. The nine sections are those which are numbered 16 in the townships which make up the reservations. The sections numbered 16 are the so-called school land sections.

From time immemorial the Chippewa Indians lived in Wisconsin and Minnesota. In 1837 by treaty, July 29, 1837, 7 Stat. 536, they ceded to the the United States a large tract in Wisconsin, but reserved the right to occupy it at the pleasure of the President of the United States. In 1842, by treaty, May 20, 1842, 7 Stat. 591, the Chippewa Indians of the Mississippi and Lake Superior in the territory of Wisconsin ceded to the United States all their remaining land in Wisconsin, but reserving the right of occupancy until required by the President to remove.

Wisconsin was admitted to the Union as a State in 1848, Act May 29, 1848, 9 Stat. 233. The act of admission provided that section 16 in every township of the United States public lands in Wisconsin should unless otherwise disposed of by the United States, be granted to the State for school purposes.

On September 30, 1854, 10 Stat. 1109, a treaty was made between the United States and the Chippewa Indians of Lake Superior and the Mississippi whereby the several bands of the Indians were given separate reservations in Wisconsin, which reservations lay within the areas always occupied by them. The descriptions of the reservation lands in the treaty by their exterior boundaries included, of course, the sections numbered 16 of the townships within the reservations. That gave rise to a question as to whether the United States had not already granted these sections to the State of Wisconsin as school sections, in the Act of 1848, admitting Wisconsin as a State. This question was not answered finally until 1918, when the Supreme Court of the United States held that the act admitting Wisconsin as a State did not immediately grant the sections numbered 16 to the State, but only agreed to do so after they had been surveyed, and then only if they had not been otherwise disposed of. Since they were not surveyed until 1864 and later, and since, in 1854, the United States had by its treaty granted the sections to the various bands of the Chippewas as reservations, the court held that there was no effective grant to the State and the sections belonged to the Indians. United States v. J. S. Stearns Lumber Company, 245 U.S. 436, 38 S.Ct. 137, 62 L.Ed. 381.

In their petition in this case the Indians claim that they did not receive the sections numbered 16, but by statements of counsel that claim has been abandoned. The only claim which they press is the claim for timber taken by third persons from the sections numbered 16, which we shall call the school land sections, and for timber wastefully cut or sawed. Although the Red Cliff band is named in the amended petition, it became apparent in the trial of the case that there is no section numbered 16 in the Red Cliff Reservation, hence no claim is pressed for that band.

The theory of the plaintiffs' case is that the United States was the guardian of the property of the Indians, and did not exercise the care which, as guardian, it should have exercised to prevent, or recover compensation for, the spoliation of the Indians' property by trespassers. The confusion which persisted for so long as to whether the Indians or the State of Wisconsin owned the sections is involved in the case because, the plaintiffs claim, the State sold some of the land to persons who removed timber from it.

Under our rule the issue in this case at this stage is only as to whether the United States is liable to the plaintiffs. If we conclude that it is liable, further hearings must be held to determine the extent of the liability and the amount of the judgment. To determine whether there is liability we must ascertain (1) whether there was spoliation

and (2) if there was, whether the United States failed to act diligently to prevent it or to recover compensation for it. A guardian is not an insurer of the ward's property. He does, having undertaken the responsibilities of the guardianship, owe a high degree of diligence to his task.

We consider the evidence as to whether there was wrongful taking of the Indians' timber. So far as the confusion as to whether the title to the school sections was in the Indians or in the State of Wisconsin was concerned, the United States authorities took the position as early as 1870 that these sections belonged to the Indians, and did not knowingly permit persons claiming under the State to occupy the land or take timber from it. Beginning as early as 1893, the United States authorities made contracts for the logging of the timberland on the reservations, which contracts did not cover the school sections, the title to which was in dispute. Logging under these contracts went on for many years, under government inspection and scaling of the logs, and the agreed price was paid by the lumber companies and deposited by the Government to the credit of the Indians. At first the timber was sold by contract without bids; later bids were taken for it. In the course of the logging of the sections adjoining the school sections extensive cutting on the school sections took place, by mistake as to boundaries or otherwise. These trespassory cuttings were, so far as appears, all paid for subsequently, on the insistence of the United States.

Not until 1917 were contracts let for regular cutting on the school sections. In 1916 Congress passed a statute, Act May 18, 1916, 39 Stat. 157, referred to in our finding 11, authorizing cutting on the school sections, the proceeds to be placed in escrow to be finally distributed after the pending litigation about the title to the school sections had been concluded.

In 1924 the Commissioner of Indian Affairs directed one Mark L. Burns to make a stump calculation of the timber alleged to have been taken from the six school sections of the Bad River Reservation, before the beginning of the authorized logging operations. Mr. Burns' method was to "scale" the stumps which he thought showed that the trees had been cut from them before the authorized logging began. He added from 2 to 6 inches to the diameter of the stumps for decay. He added from 5 to 20 percent to the number of stumps actually found so as not to miss stumps completely burned out or rotted away. His estimate of the height of the trees and the number of logs which each would produce was, according to his own statement, considerably larger than the facts, if they had been ascertainable, would have warranted. It does not appear whether or not the stumps that he scaled included the large amount of cutting done before contracts were let for the logging of the school sections, which cutting was subsequently paid for and the money was put into the funds of the Indians. For these reasons we think that the estimate in the Burns report of some 10 million feet of lumber cut from the school sections on the Bad River Reservation and not paid for, must be heavily discounted.

The evidence shows that there was considerable cutting on the school sections of the reservations for the construction of schools and other reservation improvements. There is no record of the amount of the cutting for these purposes. On one section near a railroad, many small trees had been cut, apparently to make railroad ties. It might well have been individual Indians who did this cutting to acquire some ready cash.

We think that there was some trespassory cutting of timber. That there was much such cutting, other than in the several instances shown in our findings where the Government made claim against the trespasser and obtained compensation from him, we are not convinced. In that backwoods country no one could have cut and removed any considerable quantity of timber without making a rather extensive operation of it with woods roads for hauling and facilities for floating the logs. It would have taken a long time to cut and take out the logs. The Indians hunted over the reservation. They were jealous of their rights, and prompt to complain about what was done on their lands. It does not

seem to us that an operation as extensive as would have been necessary could have taken place without their knowing of it and knowing which one of the relatively small number of operators capable of such an operation was doing it. Several old members of the bands testified in this case, whose boyhood would have been during the period in question, yet they named no one who was supposed to have wrongfully cut timber, and not been made to account for it.

Our second question is whether, assuming that there was some trespassory cutting of timber, the Government failed in its duty as a guardian by neglecting to prevent or recover for the tort. The evidence seems to us to show that the Government was diligent in its care of the Indians' property. It was consistent and uncompromising in its position that the school lands belonged to the Indians, though the legal question was by no means clear. So far as appears, it pursued and recovered compensation from those who had, by mistake or legal uncertainty as to the title or otherwise, cut logs without authority. Its failure to detect and pursue in time to recover from casual trespassers does not prove lack of diligence. There was no duty to constantly patrol these large and wild areas, especially when it was known that the wards themselves were hunting over them and were not reluctant to complain of intruders. The tone of the correspondence between the Government's agents on the reservations and their superiors in Washington indicates interest and diligence in protecting the rights of the Indians. The plaintiffs' suggestion that large quantities of illegally cut logs were floated past the Indian agency, without the agent doing anything about it, or the Indians complaining of it or knowing or remembering who did it, seems to us impossible of belief. We have found that the Government did not fail in its duty as a guardian. The plaintiffs' petition must, therefore, be dismissed.

It is so ordered.