Madden, Judge,
delivered the opinion of the court:
An Act of Congress, dated September 3, 1935, 49 Stat. 1085, conferred jurisdiction upon this Court to hear and decide the claim involved herein and other claims of the Menominee Tribe of Indians against the United States. The instant claim is for alleged maladministration by the Government in the salvaging of timber on the plaintiff’s reservation blown down by a windstorm on July 16, 1905. Under Rule 39 (a) of this Court, we first heard and determined the question whether the Government was guilty of maladministration in the circumstances and was liable to the plaintiff in damages. Our decision, which appears at 101 C. Cls. 22, was that the Government was at fault and was liable. We left for further consideration the question of the amount of the plaintiff’s damages. Voluminous evi *317 dence has since been taken on that question, a Commissioner of this Court has made a report, and the- parties have presented exceptions to that report and briefs on the questions of law and fact.
We have, then, the problem of ascertaining the amount of damages. Congress has, in the Jurisdictional Act, been quite specific as to what damages the plaintiff should receive, if the Court should find, as it has found, that there was maladministration. ■ Section 6 (d) of the Jurisdictional Act says that in that case:
* * * the Court shall award to the Menominee Tribe of Indians as damages (1) an amount equal to the net losses incurred during the year or years in which maladministration is found, with interest thereon at the rate of 4 percentum per annum from the respective dates of said losses * * *. “Net losses” shall be determined by using customary and accepted principles of accounting.
Our task, then, is to ascertain how much less the plaintiff tribe received for the products of the blow-down timber than was used up or spent in producing those products.
We turn aside, however, to comment upon some of the Government’s arguments which it presents most urgently. It urges that our prior decision that there was maladministration was a mistake; that, in the circumstances existing after the blow-down, the agents of the Government were confronted with a difficult problem which they worked out with reasonable prudence and competence so that, even though their solution resulted in losses, to the Indians, their conduct did not fall below the standard of what is required of a trustee. In addition to this criticism of our main conclusion, the Government urges as to many separate items of conduct, such as the spending of money to partially construct sawmills which were never.used and the unsuccessful attempt to float nonfloatable logs, resulting in their loss, that these items were mistakes, excusable in the circumstances, and not breaches of trust.
As to our main conclusion, reached after full hearing and consideration, only the most convincing showing that we were wrong would justify us in changing it at this late date. No *318 evidence has been offered which was not available at the time of the prior proceeding. We do not- think that our decision was unjust to the Government, and we adhere to it, That being so, we think that the question whether the conduct of the Government in certain particulars such as the ones mentioned above was or was not prudent becomes irrelevant. Under the Jurisdictional Act, which is the law of this case, once the issue of maladministration has been decided for the plaintiff, all that remains is the accounting, the ascertainment of the net losses. The fact that in some particulars the business was handled particularly well or particularly badly would have its effect in a final showing of a smaller or greater aggregate loss than would have resulted if it had been handled otherwise. But it would not affect the question of whether or not there was liability. That was decided in our prior proceeding.
When we undertake the accounting to determine the amount of the net losses resulting from the project, we are confronted immediately with the question of whether the blown-down timber, as it lay after the storm, was capital which, according to “customary and accepted principles of accounting,” having been used up in the project, should be charged as a cost. The Government urges that it should not, because of its special status as Indian property, not bought and paid for in the ordinary way. But the Indians acquired the land and timber by exchange for a valuable considerar tion, and owned it. We think the blown-down timber was their capital. Next comes a serious question as to whether it had any value. The Government urges that the timber, after it was blown down, had no capital or, in the language of lumbering, “stumpage” value. It says, and its witnesses testified, that the difficulties of logging blown-down timber are so great that the few dollars per thousand board feet measure which standing timber could have been sold for at the time and place would have been offset, and more than offset, by the added expense of logging caused by the fact that the trees were blown down. The plaintiff’s witnesses, on the other hand, testified that the logging of blown-down timber presents no great difficulties, that in some respect-5 *319 it is easier to log than standing timber, and that at the time and place the blown-down timber had substantial value. .
We think that the fact that the timber was blown down did, in fact, detract heavily from its value. But it was excellent timber, and we have concluded that it had, as it lay after the storm, a capital or stumpage value of $2.50 per thousand board feet. As to the amount of the stump-age, we have found that the logging contractors employed by the Government were paid for cutting, banking, and scaling 40,539,550 feet of logs. The plaintiff urges that it should be credited with that amount of stumpage and more, for reasons that will appear, but in finding 3 we have found that the logging contractors overscaled their work by 5,101,820 feet. The Government says that, though the logging contractors were paid for the logging of these 5,101,820 feet, the plaintiff should not be paid for their stumpage, because, although counted for payment to the logging contractors, they did not exist.
The aggregate overscaling consisted of several elements. Where the same log was caled at both ends, the overscaling represented a nonexistent log. Where a rotten or hollow part of a log was included in the scale, the question would be whether it was rotten or hollow when the tree was blown down, in which case it had no capital value to the plaintiff, or had rotted because it lay unharvested for an unreasonable time, in which case it had a capital value to the plaintiff which was lost by the Government’s maladministration. The evidence does not enable us, with any real accuracy, to apportion the overscaling as between elements for which the plaintiff should have capital credit, and those for which it should not. We allocate 2,000,000 feet of the overscale to the former elements. The plaintiff’s capital, lost or used up in the operation, in question was, then, .35,437,730 feet, the amount that, would have been shown by an accurate scale; 2,000,000 feet, the amount of overscale attributable to deterioration resulting from unreasonable delay in harvesting the timber; 734,269 feet of logs cut but left in the woods; and 687,721 feet of merchantable logs not cut but left to rot in the woods, a total of 38,859,720 feet. To this total, the *320 stumpage value of $2.50 per thousand feet will be applied, amounting to a capital charge of $97,149.30.
In addition to the capital used up in the project, we must determine the amounts of money actually expended in it. To a degree, the figures are fairly well proved. The amounts paid to logging contractors for logging and banking the logs and the amounts paid for driving or hauling the logs to the lumber mill are available in the records. There is one troublesome question in regard to expenditures. Although the logging contractors were required by their contracts to haul the logs to the mill, the Government’s agents permitted the contractors to pile some 26 million- feet of the logs along a river, upstream from the millsite. They were piled not only on the bank of the river, but out into and across its bed, and in a manner which created a serious problem of untangling them and driving them downstream. The Government thereafter expended $51,092.30 in building dams, sluiceways and other improvements in the stream to facilitate driving the logs. A considerable percentage of the logs were nonfloatable hardwoods, which were lost in driving, and others were of a type which deteriorated badly in the water. In the accounts of the mill, $49,092.30 of the $51,092.30 spent in the stream improvement was charged to driving operations during 1909. The logs driven in that year consisted of 23,647,900 feet of blown-down logs, and 1,000,000 feet of green timber cut out of the flowage of the river, apparently in clearing the way for the improvements.
The Government urges that the $49,092.30 charged to the blow-down operation was excessive because the improved stream was used in 1910,1911, and 1913 to drive some 13 million feet of logs not attributable to the blow-down. It says that a proper part of the cost of the improvements should be apportioned to the driving expense of these non-blow-down logs and credited to reduce the driving cost of the blow-down logs. The plaintiff obj ects to such a readjustment, saying that the improvements were, almost entirely, a waste of money; that adequate improvements would have cost much less if it had not been for the Government’s mismanagement in permitting the improper banking of the blown-doWn logs. *321 We think that the improvements were not, in fact, worth what they cost, and that they may not be capitalized for their cost. We conclude that $20,000 was as much as they were worth as permanent improvements, and that the logs driven after the blow-down driving was completed should be charged their proportionate part of that amount. That share, $3,665.61, should be deducted from the driving costs attributed to the blow-down logs in the mill records.
In the determination of the net loss incurred in the project, it is necessary, of course, to know how much the lumber manufactured from the logs sold for. As to a part of the lmnber, that is difficult to determine, because in the late stages of the sale of that lumber, the last half of 1910, and the first three-fourths of 1911, the lumber from the blown-down logs was mixed at the mill with lumber from green logs, which by that time was being produced in large quantities. The lumber as thus mixed was sold, and it is therefore difficult to determine, in effect, how much of the price received the lumber from the blown-down logs should be credited with. We have satisfactory evidence of the total number of thousands of feet of blow-down lumber that was sold, in sales of mixed lumber. We do not, however, have satisfactory evidence of the amount that was sold in the last half of 1910, as distinguished from the amount that was sold in the first nine months of 1911. During the period November 1, 1909, to June 30,1910, a large amount of blow-down lumber was sold, at an average price of $11.6158 per thousand feet. The plaintiff urges this fact as strong evidence that the blow-down lumber was inferior and should not be allocated a price of more than $12 per thousand in the sales of mixed lumber in later periods at an average price of more than $17 per thousand. The plaintiff points out that during the period when the blow-down lumber was being sold at $11.6158, a small amount of green lumber, 647,219 feet, was sold for $19.62 per thousand feet.
We think that the low price received for the blow-down lumber sold in the period before June 30, 1910, does not prove as much as the plaintiff contends with regard to the quality of- the blow-down lumber in the later periods. In *322 our finding 29 it is shown that the lumber manufactured in the early months of the operation of the mill was poorly manufactured, and that, as a result of statutory restrictions on the method of sale, the early sales were made at prices below the market. In our finding 30 it appears that in June 1910, a considerable number of defective logs were discarded by being sluiced over the dam, whereas in 1909 all logs delivered from Mill Sites Nos. 2 and 3 were charged to lumber operations and most of them were, apparently, milled. We think, then, that because better milling was done, and because the blown-down logs used were of better quality, and the marketing was more advantageously done in the later period when the blown-down lumber was mixed with green lumber, it would not be fair to the Government to attribute the earlier low price of some $12 per thousand feet to the blow-down luhaber contained in the mixture which, in fact, sold for more than $17 per thousand feet. But we have no doubt that the green lumber contributed more, foot for foot, to the sale price of the mixture, than did the blown-down lumber. We treat the blown-down lumber as having been worth $15 per thousand feet in the mixture, and credit the Government with that amount against the expenditures made in the project.
The plaintiff would have us, the evidence being uncertain, presume the facts to be in its favor, because of the confusion caused by the mixture of the blown-down lumber with the green lumber. This confusion was not tortious nor illegal in any sense. It was done with good motives, economy of operation and obtaining a better price for the blown-down lumber. It was not done to create difficulties in tracing the different kinds of lumber through the mill records. We think it should not put any special burden of proof upon the Government.
Our accounting, then, shows that the blow-down project cost in capital used up and money expended, $693,603.87, and returned in products sold or used $352,167.14, leaving a loss of $341,436.73. To summarize:

*323
Costs

Capital value of 38,859,720' of logs in woods_$97,149. 30
Cost of 27,731,628' of logs sawed and lumber sales- 408,277.90
Cost of 4,031,650' of logs not driven_ 27,536.17
Cost of 8,154,449' of logs not otherwise accounted for-81,310. 68
Cost of culls, scoops and otherwise unmerchantable lumber_ 22,575.06
Cost of improvements at mill sites Nos. 2 and 3, later abandoned_ 1,742.41
Additional allowance to logging contractors, not included in above_ 58,677. 96
Total_ 697,269.48
Less credit for excessive amortization of stream improve-ments_ 3, 665. 61
Net cost of blow-down project_ 693, 603. 87

Recoveries

Lumber sold and used_$350, 495. 50
Shingles and by-products, net_ 1,671. 64
Total recoveries_ 352,167.14
Net loss on blown-down timber_ 341,436. 73
INTEREST
The Jurisdictional Act provides, as we have seen, for the award to the plaintiff of interest at the rate of 4 percent “from the respective dates of said losses.” We think that since it would have been unlikely, in any event, that much, if anything, would have been realized from the sale of logs or lumber before July 1, 1907, even if the project had been well administered, the interest on the capital value of the timber should run from that date. Operating losses, other than the additional payments made to logging contractors some ten years later, should bear interest from June 15, 1908. The additional payments, made to many persons at different dates, see finding 5, should bear interest from the mean date of October 25,1918.
*324 OUTSETS
Section 11 of the Indian Claims Commission Act of August 13, 1946, 60 Stat. 1049, provides that Section 2 of that Act shall supersede the provisions of the particular jurisdictional act under which any Indian claim is asserted, “with respect to the deduction of payments, offsets, counterclaims and demands.” Section 2 provides:
In determining the quantum of relief the Commission shall make appropriate deductions for all payments made by the United States on the claim, and for all other offsets, counterclaims, and demands that would be allowable in a suit brought in the Court of Claims under section 145 of the Judicial Code (36 Stat. 1136; 28 U. S. C. sec. 250), as amended; the Commission may also inquire into and consider all money or property given to or funds expended gratuitously for the benefit of the claimant, and if it finds that the nature of the claim and the entire course of dealings and accounts between the United States and the claimant in good conscience warrants such action, may set off all or part of such expenditures against any award made to the claimant, except that it is hereby declared to be the policy of Congress that monies spent for the removal of the claimant from one place to another at the request of the United States, or for agency or other administrative, educational, health or highway purposes, or for expenditures made prior to the date of the law, treaty or Executive Order under which the claim arose, or for expenditures made pursuant to the Act of June 18,1934 (48 Stat. 984), save expenditures made under section 5 of that Act, or for expenditures under any emergency appropriation or allotment made subsequent to March 4, 1933, and generally applicable throughout the United States for relief in stricken agricultural areas, relief from distress caused by unemployment and conditions resulting therefrom, the prosecution of public work and public projects for the relief of unemployment or to increase employment, and for work relief (including the Civil Works Program) shall not be a proper offset against any award.
In our finding 37 we have a tabulation prepared by the General Accounting Office showing expenditures made for the plaintiff tribe during three periods of time, 1891-1905, *325 1906-1935, 1936-1943. Our first problem is to determine what.is “the date of the law, treaty, or Executive Order under which the claim arose” in the instant case. The plaintiff contends that its claim arose under the Jurisdictional Act of 1935, under which this Court was given jurisdiction to hear and decide this and other complaints of the plaintiff tribe. The Act not only conferred jurisdiction upon the Court, but expressly defined the status of the Government as that of a trustee. The Government says that because the plaintiff contended, in the earlier stage of this suit which resulted in our determination that the Government was liable, that the Government should have logged the blown-down timber under the Act of June 12,1890, 26 Stat. 146, the claim arose under that Act. In our finding 6 in our determination of liability in this case, 101 C. Cls. 22, 25, we found that the Government’s agents could have proceeded under the 1890 Act to salvage the blown-down timber. Their failure to do so was not, however, a violation of that law, nor of any enforceable legal duty which the Government then owed to the Indians. It was merely one of the elements made relevant by the Jurisdictional Act of 1935 to the question of whether the Government had dealt with the situation as a prudent trustee of the Indians’ property. We are aware of what has been said by the Courts, including this Court, to the effect that the Government owes to its Indian wards the duties of a trustee, even in the absence of a statute so providing. See Seminole Nation v. United States, 316 U. S. 286; Menominee Tribe of Indians v. United States, 101 C. Cls. 10, 19. The Indian Claims Commission Act, putting limits upon the offsets which the Government may present in a suit by Indians, speaks of “the date of the law, treaty, or Executive Order under which the claim arose.” The Court is of the opinion that the. year 1905, the date of the blow-down, is the date of origin of the obligation of the Government which is enforced by our judgment, and that offsets should be allowed from that date. The writer of this opinion thinks that the pertinent language of the Indian Claims Commission Act requires that some definite statute, treaty, or Executive order be pointed to as the cut-off date for offsets, and that a general unwritten duty without any date *326 of origin, such, as the duty of a trustee under the accepted principles of equity, does not satisfy that requirement. Our further consideration is limited to the expenditures sho.wn in the Comptroller General’s tabulation as having been made after 1905.
Expenditures of $70,164.40 for “maintenance of law and order” and of $163.57 for transportation for that purpose are listed. The plaintiff says this was an expense for “agency and other administrative * * * purposes” and we agree. The agent in charge of the Reservation for the Government was in charge of law enforcement, and the policemen and judges whom he hired were his assistants in that task, essential to the administration of the agency.
Items amounting to $44,383.72 for pay of and to farmers and for the pay and expenses of agricultural agents are listed. We think these are expenditures for “educational purposes,” which, under the Indian Claims Commission Act, may not be set off by the Government. The Government urges that only expenditures for education in schools, formal education, are covered by the language of the statute. We see no reason to give the statute so narrow a construction. Adult education, such as that given by teachers of farming and by agricultural agents, is of importance in the conversion of the Indians to a more settled life. These expenditures may not be set off.
The expenditure of $1,643 for pay and expenses of field matrons was for health and educational purposes, and may not be set off.
In the absence of any showing as to just what was the purpose of the expenditures for planting and harvesting crops, seeds, fruit trees and fertilizers, and agricultural implements and equipment, we assume that they were for the purpose of demonstration, and were educational. We assume the same as to items for feed and care of livestock, transportation of livestock, transportation of supplies for agricultural aid, and transportation of agricultural implements and equipment. The Government has the burden of proving the propriety of the offsets which it asserts. When, therefore, an item is asserted as an offset which so far as the evidence shows may or may not have been expended *327 for one of the purposes for which offsets cannot be made,;,we must'resolve the doubt against the offset. The remaining items, listed in finding 38, and amounting to $5,971.52 are proper offsets. The plaintiff calls our attention to the language of Section 2 of the Indians Claims Commission Act, quoted above, that offsets should be allowed only if “the entire course of dealings and accounts between the United States and the claimant in good conscience warrants such action * * We find nothing in the course of dealings which makes it unconscionable for the Government to assert offsets in this case.
The plaintiff is entitled to recover $896,208.78 which consists of $341,436.73 of principal and $560,743.57 of interest, less offsets of $5,971.52, together with interest at the rate of four percent per annum on the sum of three hundred forty-one thousand four hundred thirty-six dollars and seventy-three cents ($341,436.73) from January 10, 1951, until the net amount of this judgment shall be placed in the Treasury of the United States to the credit of the said Menominee Indians.
Judgment will be entered accordingly.
It is so ordered.
Howell, Judge; Whitaker, Judge; LittletoN, Judge; and JoNes, Chief Judge, concur.