UNITED STATES

v.

SEMINOLE NATION.

No. 3-58.

United States Court of Claims.

June 3, 1959.

Clifford R. Stearns, Washington, D. C., with whom was Perry W. Morton, Asst. Atty. Gen., for appellant, United States.

Paul M. Niebell, Washington, D. C., Roy St. Lewis, Washington, D. C., on the brief, for appellee, Seminole Nation.

JONES, Chief Judge.

This is an appeal by the United States,[1] defendant below, of a final determination by the Indian Claims Commission that petitioner, the Seminole Nation, is entitled to recover from the Government the sum of $34,213.66, less offsets of $160.00, or the net sum of $34,053.66. The basis for the award was the Commission's decision that, under the circumstances of the case, the Secretary of the Interior failed to discharge a duty owed by the Government to the appellee Indians in not canceling a sale of Seminole Nation land and reselling it for the benefit of the Indians at its enhanced value.

The land involved in this suit consists of a 320-acre tract located in Seminole County, Oklahoma. Referred to as the Emahaka School tract, it was, at the time of its sale and conveyance, the property

1. The appeal is brought under the Indian Claims Commission Act of 1946, 60 Stat. 1049, 25 U.S.C.A. § 70s, and Rule 58 of the United States Court of Claims, 28 U.S.C.A.

of the Seminole Nation.[2] An appraisal of the tract was made in 1919 by officials of the Department of the Interior. As a consequence, a value of $16,700 was assigned to the land, a sum which included $6.00 an acre for oil and gas, and $2,000 for improvements.

At about this same time, and shortly before sale of the tract at public auction, the drilling of a test well located one and one-quarter miles north of the Emahaka School tract was begun. The Superintendent of the Five Civilized Tribes, Muskogee, Oklahoma, was notified in a letter dated January 23, 1920, of this fact by the United States Oil Inspector, and of the probable enhancement in value of the Emahaka School tract should the well be completed.

On May 26, 1920, the Department of the Interior granted authority to the Superintendent of the Five Civilized Tribes at Muskogee, Oklahoma, to sell the Emahaka School tract at public auction to the highest bidder under the provisions of the Act of April 30, 1908, 35 Stat. 70, 71,[3] for an amount not less than the appraised value. At or about this time the 1919 appraisal was revised by the Government by increasing the mineral value of the tract from $6 an acre to $25 an acre. The total appraised value of the land was thus increased to $22,780.

On July 31, 1920, the Emahaka tract was sold at public auction, following notification of such sale, to one Walter Ferguson for $27,280. As stated by the

Commission in its finding number 5, the notice of the sale and other evidence in the record indicates that the terms of sale were as follows:

"Terms: Twenty-five per cent of the purchase price must be paid on the date of sale, 25% in one year, and the balance in two years from date of sale; deferred installments to draw 5% interest, provided that the entire amount may be paid at any time before the expiration of one year, if so desired. Patent will be issued immediately upon full payment. Should any payment be not made when due, the sale thereof may be canceled and the rights of the purchaser therein declared forfeited, in the discretion of the Secretary of the Interior."

At the time of the sale Ferguson paid the required twenty-five percent of the purchase price, or $6,820. Under the terms of sale installment payments covering the balance of the purchase price, with accumulated interest, were due on July 31, 1921, and July 31, 1922. But no further payment on the tract was made by Ferguson even though Government officials repeatedly requested the amount remaining due. Cancellation of the sale for default was authorized under the terms of sale but the Government elected not to exercise that authority.

On November 28, 1922, Ferguson notified the Department of the Interior that he was transferring his interest in the

2. The Emahaka School tract had been set aside for the Seminoles under Article III of the Treaty of March 21, 1866, 14 Stat. 756. Seminole Nation v. United States, 102 Ct.Cl. 565, certiorari denied 326 U.S. 719, 66 S.Ct. 24, 90 L.Ed. 426.

3. The relevant part of the Act of April 30, 1908, 35 Stat. 70, 71 provides:
"The Secretary of the Interior shall take possession of all buildings on lands belonging to the Five Civilized Tribes, now or heretofore used for governmental, school, or other tribal purposes, together with the furniture therein and the land appertaining thereto, and appraise and sell the same at such time and under such rules and regulations as he may prescribe and deposit the proceeds, less

expenses incident to the appraisement and sale, in the Treasury of the United States, to the credit of the tribes respectively owning the said land and improvements, and immediately after any such sale patents for the realty thus sold shall be made and delivered in the same manner as now provided by law for other tribal property: *Provided*, That when practicable preference right shall be given to the State, counties and municipalities of Oklahoma to purchase said lands and improvements at the appraised value: *And provided*, That pending such appraisement and sale the Secretary of the Interior may temporarily lease said buildings and lands for the benefit of the tribes respectively to which they belong."

Emahaka School tract to a V. V. Harris. On February 5, 1923, Harris paid the balance due, consisting of both principal and interest, under the July 31, 1920, sale of the land.[4]

A Principal Chief of the Seminole Nation was appointed by the United States to execute a deed conveying title to the Emahaka tract to Harris. The Principal Chief protested the sale, however, and refused to sign the patent. As stated in the protest, made on June 26, 1923, the Seminole Tribe had never agreed to the sale of the property; the purchaser had neglected the payments on the property and failed to carry out the terms of the purchase; the price received was inadequate; the property had great oil value and should be retained for the benefit of the Seminole Nation; and the purchaser who neglected payments on the property had intended not to comply with the terms of purchase, but, instead, was willing to let the property be returned to the Seminoles.

Thereafter Harris requested of the Commissioner of Indian Affairs that a patent to the Emahaka School tract be issued to him notwithstanding the protest by the Seminoles. This request was granted when on December 22, 1924, a patent was issued to Harris, signed by the Secretary of the Interior pursuant to Section 6 of the Act of April 26, 1906, 34 Stat. 137,[5] and the Act of April 30, 1908, supra, but without the signature of the Principal Chief of the Seminole Nation.

Because the patent had not been signed by the Principal Chief of the Seminole Nation under the provisions of the Seminole Agreement, July 1, 1898, 30 Stat. 567, Harris experienced difficulties when he later tried to dispose of the land. Handicapped in this respect, he sought from the Interior Department a patent to the tract signed by the Principal Chief of the Seminole Nation. The Government appointed another Principal Chief to execute such a conveyance, but he too refused to sign a patent conveying title to Harris. The patent to V. V. Harris was never signed by the Principal Chief of the Seminole Nation.

On the record presented the Indian Claims Commission found that, following the sale to Ferguson on July 31, 1920, oil activity in the vicinity of the Emahaka School tract greatly increased, and so too did the value of the property for oil and gas. Commission finding number 7. The value of the tract, including surface and minerals, between July 31, 1920, and February 5, 1923, and December 22, 1924, was determined by the Commission to be $200 per acre.

Liability against the United States was found by the Commission in the Government's inattention to the Seminoles' continuous protests of the July 31, 1920, sale, protests directed not only to the sale it-

---

4. The total amount paid for the land, which includes interest on the deferred installments, was $29,786.34.

5. Section 6 of the Act of April 26, 1906, 34 Stat. 137, 139, provides:

"Sec. 6. That if the principal chief of the Choctaw, Cherokee, Creek, or Seminole tribe, or the governor of the Chickasaw tribe shall refuse or neglect to perform the duties devolving upon him, he may be removed from office by the President of the United States, or if any such executive become permanently disabled, the office may be declared vacant by the President of the United States, who may fill any vacancy arising from removal, disability or death of the incumbent, by appointment of a citizen by blood of the tribe.

"If any such executive shall fail, refuse or neglect, for thirty days after notice that any instrument is ready for his signature, to appear at a place to be designated by the Secretary of the Interior and execute the same, such instrument may be approved by the Secretary of the Interior without such execution, and when so approved and recorded shall convey legal title, and such approval shall be conclusive evidence that such executive or chief refused or neglected after notice to execute such instrument.

"Provided, That the principal chief of the Seminole Nation is hereby authorized to execute the deeds to allottees in the Seminole Nation prior to the time when the Seminole government shall cease to exist."

self but also to the extensions granted to the defaulting purchaser, and in the Government's refusal to consider the claimed increase in the mineral value of the land as a basis for canceling the 1920 sale. These circumstances indicated that the Government, in its failure to cancel the sale, was giving consideration solely to the treatment it thought should be extended the purchaser. In this manner of conduct, said the Commission, the Government failed to discharge its duty to the Seminoles. Commission finding number 13.

The measure of recovery allowed the Seminole Nation was the difference in the surface and mineral value of the land as found by the Commission, i. e., $200 per acre, or a total of $64,000, and the amount received, $29,786.34—or a net sum of $34,213.66 subject to any allowable offset. The majority opinion of the Commission was written by Chief Commissioner Witt, in which Commissioner Holt concurred. A dissenting opinion was issued by Commissioner O'Marr. 4 Ind.Cl.Comm. 66.

A subsequent hearing was held before the Commission on the question of the Government's offsets. Findings of fact were made on that issue, and an opinion rendered holding that the Government was entitled to offsets in the amount of $160. 6 Ind.Cl.Comm. 336. Thereafter the Commission entered its conclusions of law and final award in favor of the Seminole Nation in the net amount of $34,053.66.

■ In its appeal to this court the Government initially questions the jurisdiction of the Indian Claims Commission to review the discretionary action of the Secretary of the Interior in this case, absent proof of fraud or capricious conduct on his part. The Government refers us to several decisions in support of this view. Cherokee Nation v. Hitchcock, 187 U.S. 294, 23 S.Ct. 115, 47 L.Ed. 183; Anicker v. Gunsburg, 246 U.S. 110, 38 S.Ct. 228, 62 L.Ed. 603; United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113; United States v. Moorman, 338 U.S. 457, 461, 70 S.Ct. 288, 94 L.Ed. 256; In re Electric Power & Light Corp., 2 Cir., 176 F.2d 687; Wagner Whirler & Derrick Corp. v. United States, 121 F. Supp. 664, 128 Ct.Cl. 382, 385–386; Croghan v. United States, 89 F.Supp. 1002, 116 Ct.Cl. 577, 586, certiorari denied 340 U.S. 854, 71 S.Ct. 71, 95 L.Ed. 626; Mole Lake Band v. United States, 82 F.Supp. 342, 113 Ct.Cl. 16, 28.

■■ The force of appellant's argument on this point is lost, however, in the circumstances which gave rise to the Indian Claims Commission Act of 1946, 60 Stat. 1049, 25 U.S.C.A. § 70 et seq., and in the extraordinary remedies created by that legislation. The peculiar nature of the early dealings between the Government and the Indians supplied the need for legislation such as found in the Indian Claims Commission Act. The act was designed to help erase certain evils of long standing.[6] Congress' solution to the problem was unusual. For Section 2 of the act, which sets forth the type of claims to be heard and determined by the Indian Claims Commission,[7] in part recognizes liability in the United States

6. In Otoe and Missouria Tribe of Indians v. United States, 131 F.Supp. 265, at page 271, 131 Ct.Cl. 593, at page 602, where this court discussed at some length the history of the Indian Claims Commission Act, it was said:

"The Indian Claims Commission Act is both remedial legislation and special legislation. It broadens the Government's consent to suit and as such is in derogation of its sovereignty. It confers special privileges upon the Indian claimants apart from the rest of the community, and to some extent is in derogation of the common law. This was, we think, because of the peculiar nature of the dealings between the Government and Indians from very early times. On the other hand, it remedies defects in the common law and in pre-existing statutory law as those laws affected Indians, and *it was designed to correct certain evils of long standing and well known to congress.*"

7. Section 2 of the Indian Claims Commission Act provides:

"The Commission shall hear and determine the following claims against the

where none had existed before. In thus creating new causes of action Congress was exercising a political function.[8]

■ The Government's contention, if sustained, would deprive the act of much of its meaning. Under the act the Indian Claims Commission is given extremely broad jurisdiction to finally determine the many outstanding Indian claims. This was the object of the act. See Assiniboine Indian Tribe v. United States, 121 F.Supp. 906, 128 Ct.Cl. 617, 629–630; Pawnee Indian Tribe of Oklahoma v. United States, 109 F.Supp. 860, 124 Ct. Cl. 324, 339. Not only would the Government's position frustrate the purpose of the Indian Claims Commission Act,

but it would also misconceive the relationship which often arises between the Government and Indian tribes. That of course is where the Government assumes a fiduciary obligation toward the Indians. A breach of that obligation by the Government may obviously involve conduct less than arbitrary, capricious, or fraudulent by an official charged with the position of trust. Judicial review of the Government's actions, whether they be termed discretionary or not, is called for in that situation. For this reason, the cases cited to us by the appellant which serve to limit judicial review of administrative decisions where that same element of "trust" is lacking are of little assistance here.[9] We are of the opinion

United States on behalf of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska: (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by claimant; and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity. No claim accruing after the date of the approval of this Act shall be considered by the Commission."

8. We have said in Otoe and Missouria Tribe of Indians v. United States, supra, 131 F.Supp. at page 269, 131 Ct.Cl. at page 598:
"As pointed out by defendant, the function of recognizing liability in the United States for claims that have no legal or equitable basis under existing law is a political and not a judicial function. We think it is quite clear from the face

of the Indian Claims Commission Act that in its passage Congress was, to a certain extent, exercising its political function of creating certain new causes of action and recognizing liability in the United States, if the facts warranted, in connection with such causes. In fact, the Act clearly creates causes of action and permits suit thereon which would not have been possible, and are not possible, as far as we know, between private individuals."

9. The cases cited by appellant are, with one exception, inapplicable to the situation before us. None of them arose out of provisions of the Indian Claims Commission Act. Thus in Cherokee Nation v. Hitchcock, 187 U.S. 294, 23 S.Ct. 115, 47 L.Ed. 183, the only issue before the Court involved the constitutionality of the Act of June 28, 1898, 30 Stat. 495, an act which in part authorized the Secretary of the Interior to lease Indian lands. In Anicker v. Gunsburg, 246 U.S. 110, 38 S.Ct. 228, 62 L.Ed. 603, the Court stressed the discretion given the Secretary of the Interior, under legislation applicable to the facts in that case (the Act of April 26, 1906, 34 Stat. 145; the Act of May 27, 1908, 35 Stat. 312), in approving or disapproving leases of Indian lands where his action was challenged, not by the Indians, but by a third party. We are unable to find any language in the opinion which would lend support to the Government's interpretation of the effect of that decision. United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113, United States v. Moorman, 338 U.S. 457, 70 S.Ct. 288, 94 L.Ed. 256; and Wagner Whirler & Derrick Corp. v. United States, 121 F.Supp.

that the Indian Claims Commission had the jurisdiction to review the actions of the Secretary of the Interior which form the basis of this complaint.

Appellant's second objection goes to the majority of the Commission's finding that "the defendant by its conduct failed to discharge its duty to the plaintiff." It is argued that the finding is not supported by substantial evidence.

■ In passing on this question, it should be emphasized that our responsibility ends when we are satisfied that the findings of the Indian Claims Commission are supported by substantial evidence. That we might have reached a contrary result on the evidence introduced is not the test. Snake or Piute Indians of Former Malheur Reservation in Oregon v. United States, 112 F.Supp. 543, 125 Ct.Cl. 241, 253; Osage Nations of Indians v. United States, 97 F.Supp. 381, 119 Ct.Cl. 592, 615; Otoe and Missouria Tribes v. United States, supra; Chitto v. United States, 138 F.Supp. 253, 133 Ct.Cl. 643, certiorari denied 352 U.S. 841, 77 S.Ct. 64, 1 L.Ed.2d 57; Yuchi (Euchee) Tribe of Indians v. United States, 145 F.Supp. 206, 136 Ct.Cl. 433,

certiorari denied 352 U.S. 1016, 77 S.Ct. 558, 1 L.Ed.2d 546, rehearing denied 353 U.S. 919, 948, 77 S.Ct. 662, 1 L.Ed.2d 669.

■ Whether the Commission's finding that the Government breached its duty to the Seminole Nation is supported by substantial evidence necessarily depends upon the nature of that duty and the standards of conduct which it imposes. The relationship between the United States and Indian Tribes has been described by courts as similar to that existing between "guardian and ward." It has also been characterized as a fiduciary relationship. Gila River Pima-Maricopa Indian Community v. United States, 140 F.Supp. 776, 135 Ct.Cl. 180, 185–189. Whatever the expression or term used, the relationship is one founded upon a distinctive obligation of trust. The obligation owed by the Government basically grows out of the dependent status of its Indian "wards." Seminole Nation v. United States, 316 U.S. 286, 296–297, 651, 62 S.Ct. 1049, 86 L.Ed. 1480.[10] Preciseness in the relationship is found in the treaty, agreement, order, or statute under which the claim is brought.

664, 128 Ct.Cl. 382, involving finality clauses included in Government contracts, are clearly distinguishable. The case of Croghan v. United States, 89 F. Supp. 1002, 116 Ct.Cl. 577, involving the separation of an employee from Government service for misconduct and neglect, also raises considerations entirely different from those presented in the instant case. Furthermore, the same factors which restrain judicial review of the exercise of administrative discretion in the complex field of securities regulation are not present in this situation. For that reason In re Electric Power & Light Corp., 2 Cir., 176 F.2d 687, is not applicable. The only case cited by the Government which is applicable to the facts under review is Mole Lake Band v. United States, 82 F.Supp. 342, 113 Ct.Cl. 16—a decision which harms rather than helps the Government's cause. That case was brought under a special jurisdictional act, and the court there held that the evidence did not establish that the Government had not been diligent in its care of the plaintiffs' timberlands. The inference to be drawn from

that decision is plain: if the Government had failed in its duty to the plaintiffs, recovery would have been allowed.

10. The Supreme Court in Seminole Nation v. United States, 316 U.S. 286, 296–297, 651, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480, stated the principle to govern in transactions between the United States and Indians in these words:

"* * * this Court has recognized the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people. * * * In carrying out its treaty obligations with the Indian tribes, the Government is something more than a mere contracting party. Under a humane and self imposed policy which has found expression in many acts of Congress and numerous decisions of this Court, it has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards."

Gila River Pima-Maricopa Indian Community v. United States, supra.[11] Here the obligation of the Government to the Seminole Nation is found in the Act of April 30, 1908, supra, and the terms and conditions of sale of the Emahaka School tract as prescribed by the Secretary of the Interior.

Thus, the Act of April 30, 1908, supra, directed the sale of tribal property belonging to the Five Civilized Tribes for the benefit of the respective tribes owning the property under such rules and regulations as may be imposed by the Secretary of the Interior. The record appearing before the Indian Claims Commission discloses that the Government's terms of sale of the Emahaka tract allowed the purchase of the land on an installment basis. The time in which the deferred payments had to be made was specified. Concluding the terms of sale was the provision: "Should any payment be not made when due, the sale thereof may be canceled and the rights of the purchaser therein declared forfeited, in the discretion of the Secretary of the Interior." This provision, obviously inserted for the benefit of the Seminoles, lodged in the Secretary a high degree of responsibility to the Seminole Nation. Decision as to its use or nonuse clearly required that consideration be given to the Indians and the price they could, or should receive for the Emahaka tract. The majority of the Indian Claims Commission is correct in its statement that where, following default in payment of the purchase price, and notwithstanding the protests of the Indians to the sale, the Secretary elects not to invoke the provision and cancel the sale, he breaches his duty to the Seminoles when his election is based solely upon consideration given to the purchaser.

On the evidence presented a majority of the Indian Claims Commission made the following finding (number 13):

"Protests by the plaintiff Indians were made to the sale of the property at the time its sale was contracted in 1920. They thereafter protested to the extension granted by the defendant to the purchaser for the payment of the deferred installments agreed to be paid by him. They refused to join in the execution of the deed that was finally executed by the defendant. The defendant at all times refused to consider the claimed increase in the value of the land as a reason for cancellation of the 1920 purchase contract. The defendant in its refusal and failure to cancel said purchase contract gave consideration solely to the treatment it thought should be accorded the purchaser.

"The defendant by its conduct failed to discharge its duty to the plaintiff."

We have carefully examined the record on this point, considering not only the evidence which supports the above finding but also that which detracts from it, and are satisfied that the disputed

---

11. In Gila River, 140 F.Supp. at page 780, 135 Ct.Cl. at page 189, this court said: "Whether or not the legal relationship of guardian and ward exists between a particular Indian tribe and the United States depends, we think, upon the express provisions of the particular treaty, agreement, executive order, or statute under which the claim presented arises. It is true that the word 'fiduciary' and the expression 'guardian ward relationship' have been used by the courts to describe generally the nature of the relationship existing between the Indians and the Government. However, in the absence of some language in a treaty, agreement or statute spelling out such a relationship, the courts seem to have meant merely that the relationship between the Indians and the Government is 'similar to' or 'resembles' such a legal relationship and that doubtful language in the treaty or statute under consideration should be interpreted in favor of the weak and dependent Indians. Creek Nation v. United States, 318 U.S. 629, 642, 63 S.Ct. 784, 87 L.Ed. 1046. For cases in which the court found the relationship of the Government to the Indians to be that of a fiduciary, see Menominee Tribe of Indians v. United States, 55 F. Supp. 137, 102 Ct.Cl. 555; Seminole Nation v. United States, 316 U.S. 286, 297, 651, 62 S.Ct. 1049, 86 L.Ed. 1480, 1777.

finding is supported by substantial evidence.

Likewise we have examined the record as it bears on the Commission's finding number 14:

"The value, including surface and minerals, of the 320 acre tract known as the Emahaka School Tract between July 31, 1920 and February 5, 1923, and December 22, 1924 was $200.00 per acre."

and find that it is supported by substantial evidence.

■ The Government further questions the proceedings below in its suggestion that the Commission erred in overruling appellant's motion for rehearing. The motion was directed to the fact that the Commissioner who wrote the majority opinion was not present when testimony was heard on the value of the Emahaka tract. It is urged that the valuation placed on the land turned on the weight given to the oral testimony of the witnesses, and that the one Commissioner could therefore not properly evaluate such evidence.

Appellant points to the recent case of WIBC, Inc. v. Federal Communications Commission, 104 U.S.App.D.C. 126, 259 F.2d 941, as clarifying, if not supporting, its argument. In that case the Court of Appeals for the District of Columbia vacated an order of the Federal Communications Commission where the decisive vote was cast by a Commissioner who had not heard the oral argument. The case is of little help, other than for the suggestion it contains that legislation might remedy the problem which the Government now complains of. For the Communications Act itself provides that the Commission shall upon request hear oral argument. Act of June 19, 1934, 48 Stat. 1064, 1096, 47 U.S.C.A. § 409(b). The Indian Claims Commission Act does not include a similar requirement; nor does it contain a provision disqualifying from later participation in a case a Commissioner who was not present at the time oral testimony was received. We find no error in the procedure adopted by the Commission in the disposition of this case.

■ The appellant lastly contends that the Commission erred in not allowing certain offsets where, in appellant's words, it had established a *prima facie* case and the appellee had failed to offer any evidence.

Following the Commission's interlocutory award to the Seminole Nation of $34,213.66—"less offsets, if any, to which the Government may show itself entitled", a hearing was conducted on the question of offsets. In support of its offset claims, the appellant there introduced General Accounting Office reports and other documentary evidence showing disbursements which it claimed were for the benefit of the Seminole Nation, and also presented the testimony of an employee of the General Accounting Office. The petitioner below offered no evidence in rebuttal of the Government's evidence. The Commission, based on its examination of the documents submitted and consideration of the oral testimony given, determined that virtually all of the disbursements were for individual indigent Indians, educational use, or for administrative expenses of the Five Civilized Tribes Agency—expenditures for purposes which are not available for offset against an award by the Commission.[12]

12. Section 2 of the Indian Claims Commission Act, supra, provides:

"* * * the Commission may also inquire into and consider all money or property given to or funds expended gratuitously for the benefit of the claimant and if it finds that the nature of the claim and the entire course of dealings and accounts between the United States and the claimant in good conscience warrants such action, may set off all or part of such expenditures against any award made to the claimant, except that it is hereby declared to be the policy of Congress that monies spent for the removal of the claimant from one place to another at the request of the United States, or for agency or other administrative, educational, health or highway purposes, or for expenditures made prior to the date of the law, treaty or Executive Order under which the claim arose, or for ex-

See United States v. Kiowa, Comanche and Apache Tribes, 5 Ind.Cls.Comm. 297; Ct.Cl., 163 F.Supp. 603. The evidence before the Commission indicated, however, disbursements of $160.00 for funeral expenses for indigent Indians. This item, in accordance wtih the decision in Quapaw Tribe of Indians v. United States, 1 Ind.Cl.Comm. 644, affirmed 120 F.Supp. 283, 128 Ct.Cl. 45, was allowed as an offset by the Commission.

 By way of answering the Government's contention, it is to be emphasized that the burden is on the United States to prove the offsets it claims. Menominee Tribe of Indians v. United States, 118 Ct.Cl. 290, 326-327. We have further said that reports of the General Accounting Office are not conclusive on this matter. The determination of whether facts have been established that would support an allowable offset is for the Indian Claims Commission, subject to review by this court. United States v. Kiowa, Comanche and Apache Tribes, Ct. Cl., 163 F.Supp. 603. That determination can and must be made by the Commission on the evidence presented, whether it consists entirely of matter submitted by the Government, or includes rebuttal evidence presented by the petitioner. The General Accounting Office reports reflect disbursements for funeral expenses for indigent Indians, thus establishing an offset for that item. But where those reports, coupled with the explanatory testimony of a Government employee, raise some doubt as to the purposes for which the expenditures were made,[13] or clearly show disbursements which cannot be offset, the Government

has not only failed in its *prima facie* showing, but also has not met its burden of proof. The Indian Claims Commission found that to be the case as to all items except the funeral expenses. We have carefully examined the record in this regard and are satisfied that the Commission did not err as a matter of law in refusing to rule that the Government had made a *prima facie* case on the evidence submitted.

For the above reasons, the findings and decisions of the Indian Claims Commission in this case are affirmed.

LARAMORE, MADDEN, and WHITAKER, Judges, concur.

penditures made pursuant to the Act of June 18, 1934 (48 Stat. 984), save expenditures made under section 5 of that Act, or for expenditures under any emergency appropriation or allotment made subsequent to March 4, 1933, and generally applicable throughout the United States for relief in stricken agricultural areas, relief from distress caused by unemployment and conditions resulting therefrom, the prosecution of public work and public projects for the relief of unemployment or to increase employment,

and for work relief (including the Civil Works Program) shall not be a proper offset against any award."

13. In Menominee Tribe of Indians v. United States, 118 Ct.Cl. 290, 326-327, we said:
"* * * When * * * an item is asserted as an offset which so far as the evidence shows may or may not have been expended for one of the purposes for which offsets cannot be made, we must resolve the doubt against the offset. * * *"